1

2

3

4                    UNITED STATES DISTRICT COURT

5                   NORTHERN DISTRICT OF CALIFORNIA

6

7    EAST WEST BANK,                          Case No. 20-cv-07364-WHO

                     Plaintiff,
8
                                              **ORDER GRANTING PRELIMINARY**
9         v.                                  **INJUNCTION AND MOTION TO**
                                              **DISMISS**
10   SUKEERT SHANKER, et al.,
                                              Re: Dkt. Nos. 50, 51, 57, 61, 74
                     Defendants.
11

12

13        Plaintiff East West Bank ("EWB") moves for a preliminary injunction to enjoin defendants

14   Sukeert Shanker ("Shanker") and Aeldra Financial, Inc. ("Aeldra") (collectively, "Defendants")

15   from, among other things, using, disclosing, distributing, or retaining EWB's confidential,

16   proprietary, or trade secret information.  Shanker was EWB's "Chief Operating Officer—Digital

17   Banking" until he was terminated in April 2019.  Before he left, he forwarded a significant number

18   of EWB's documents to his personal email accounts.  In October 2019, he incorporated Aeldra, a

19   mobile banking platform.  Since then, he admits that he forwarded various EWB documents to

20   Aeldra's COO and other third parties.

21        On this record, it appears that EWB will likely succeed on the merits of its claims because

22   Defendants unlawfully acquired and used EWB's trade secrets to create a competing product.  On

23   that basis, an injunction is appropriate.  That said, Defendants assert that they have now returned

24   all EWB property to EWB and are not using any trade secret of EWB.  As a result, they have not

25   identified any harm that would result from the proposed injunction.  In this circumstance, the

26   proposed injunction will at a minimum preserve the status quo while the record is better developed

27   to demonstrate whether Defendants' representations are accurate and will protect EWB's

28   intellectual property rights from irreparable injury if not.  I will not require a bond.

United States District Court
Northern District of California

1   Aeldra also moves to dismiss EWB's CAL. BUS. & PROF. CODE § 17200 claim because

2   California's Uniform Trade Secrets Act supersedes it.  Aeldra is correct given the current pleading

3   and its motion is GRANTED with leave to amend.

4   <center>**BACKGROUND**</center>

5   **I.   FACTUAL HISTORY**

6   From December 22, 2017 through April 30, 2019, Shanker was employed by EWB as a

7   "Chief Operating Officer—Digital Banking."  Dkt. No. 45 ("First Amended Complaint" or

8   "FAC") ¶ 27.  At EWB, Shanker was part of the development for the Velo software application

9   ("Velo"), a global digital banking service that, among other things, assists non-resident aliens

10  ("NRA") with opening bank accounts in the United States.  *Id.* ¶¶ 14, 29.

11  Velo launched in the United States and China in May 2019 and was the first of its kind:  a

12  digital product to allow non-U.S. citizens to open new U.S. bank accounts without a social

13  security number or an in-person bank visit.  Dkt. No. 50-11 ("Nambiar Decl.") ¶¶ 5, 10.  EWB

14  "invested substantial amounts of financial resources, time, and effort to develop the Velo platform, its

15  innovative real-time onboarding technology, and its proprietary compliance policies, methods, and

16  procedures that comply with federal banking laws and minimize EWB's exposure to fraud and money

17  laundering."  *Id.* ¶ 9.  EWB continues to spend significant financial resources on its Velo platform,

18  "including for new product features and services, geographic territory expansions, and release

19  updates."  *Id.*  Velo launched in India in August 2020 and is presently available through business to

20  business corporate partnerships.  *Id.* ¶ 10.  EWB launched in Hong Kong in December 2020 and plans

21  to launch Velo in Taiwan in 2021 as part of its global expansion strategy.  *Id.*

22  In early March 2019, Shanker had meetings with EWB management about his performance

23  review and bonus compensation.  Dkt. No. 64-18 ("Shanker Decl.") ¶¶ 17–26.  After a brief

24  positive performance review on February 25, 2019, on March 7, 2019, Shanker met with his

25  supervisor Catherine Zhou ("Zhou") about his formal performance review, during which he was

26  told that he would not receive a larger bonus that he claims he was promised during his hiring

27  process.  *Id.* ¶¶ 17–18.  Shanker had another meeting with Zhou on March 8, 2019 to discuss the

28  bonus issue.  *Id.* ¶ 19.  Then on March 11, 2019, Shanker met with Zhou and EWB's head of

<div style="writing-mode: vertical-rl">United States District Court<br/>Northern District of California</div>

<center>2</center>

United States District Court
Northern District of California

1   Human Resources, Gary Teo, but was unable to resolve the bonus dispute. *Id.* In the afternoon of

2   March 13, 2019, Shanker met with Zhou and EWB's CEO, Dominic Ng, to discuss the bonus

3   issue but again failed to come to a resolution. *Id.* ¶ 23. During this meeting, Zhou also told

4   Shanker that his employment would be terminated due to the breakdown of their relationship. *Id.*

5   ¶ 26.

6       Shanker's employment with EWB terminated on April 30, 2019. FAC ¶ 27. There is a

7   dispute about whether Shanker stopped working at EWB on March 14, 2019, despite remaining on

8   the payroll until April 30, 2019 or whether he continued working for EWB in April 2019.

9   *Compare* Dkt. No. 75-19 ("Wang Reply Decl.") ¶ 2 *with* Shanker Decl. ¶ 31.

10      Between March 12, 2019 and March 14, 2019, Shanker forwarded EWB's documents to

11  his personal email account. *Id.*; *see* Dkt. No. 74-28 ("Wang Reply Decl., Ex. A") (an inventory of

12  documents Shanker forwarded to his personal email accounts on or around March 13, 2019).

13  Shanker explains that he forwarded EWB's documents, most of which he was the primary author

14  for, to his personal email account in anticipation of the March 13, 2019 meeting about his bonus as

15  evidence of his significant contributions to Velo's development. Shanker Decl. ¶¶ 23–24.

16      As part of Shanker's employment and resignation, Shanker signed two confidentiality

17  agreements, agreeing not to use any of EWB's confidential information for any purpose other than

18  for EWB's benefit ("Confidentiality Agreements"). FAC ¶¶ 28, 31. Around the time of Shanker's

19  departure, EWB and Shanker entered into a settlement agreement due to the bonus dispute

20  ("Settlement Agreement"). *Id.* ¶ 32. As part of the Settlement Agreement, Shanker agreed to turn

21  over all of EWB's property. *Id.* ¶¶ 33–34.

22      A few months after his departure, Shanker incorporated Aeldra, a mobile banking

23  platform, in Delaware on October 29, 2019. Shanker Decl. ¶ 33. EWB alleges that Aeldra

24  purports to allow non-U.S. citizens to open a bank account with a cell phone application, a similar

25  service in direct competition to Velo. FAC ¶ 42. In July 2020, EWB sent Shanker a letter

26  accusing Shanker of misappropriating its trade secrets. Shanker Decl. ¶ 48. On October 18, 2020,

27  Shanker announced on LinkedIn that he had started a new fintech business called Aeldra. Dkt.

28  No. 37-2 ¶ 5. Two days later, on October 20, 2020, EWB filed this lawsuit against Shanker,

1     alleging that Shanker had, among other things, misappropriated EWB's trade secrets to create

2     Aeldra, a direct competitor to EWB's mobile banking platform, Velo ("Complaint").  Dkt. No. 1

3     ("Compl.") ¶¶ 40–43.

4          On December 10, 2020, Aeldra publicly launched.  Dkt. No. 51-1 at 21–22 ("Aeldra Press

5     Release").  The Press Release lauded Aeldra's "first-of-a-kind capability" to "offer[] seamless

6     borderless banking enabling global citizens to open a U.S. bank account in 5 minutes on their

7     mobile from overseas," which would "open[] up a $20B market."  *Id.*  To build Aeldra, it

8     partnered with three third parties:  Blue Ridge Bank, National Association ("Blue Ridge Bank"),

9     FS Vector LLC ("FS Vector"), and i2c, Inc. ("i2c").  Shanker Decl. ¶¶ 37–38, 45.

10         Shanker admits that he forwarded the following EWB documents to third parties, including

11    Aeldra's Chief Operating Officer ("COO"), Venkat Gopalakrishnan, before the launch of Aeldra:

12    (1) On April 14, 2020, Shanker sent Gopalakrishnan a document titled "Recommended On-Boarding

13    Flow V5," dated January 7, 2018; (2) On August 24, 2019, Shanker sent Rohit Mehtani, who at the

14    time was still employed by EWB, photographs of a PowerPoint deck titled "EWB—Digital Bank

15    Fraud Management Approach Project Update," dated June 1, 2018 and a one-page document called

16    "Copy of IBM Pinpoint Decision Flow and Azure Logic"; (3) on May 7, 2020, Shanker forwarded to

17    Gopalakrishnan an Excel spreadsheet bearing the filename "20180611_Velo Product Roadmap_V6";

18    and (4) On August 14, 2019, Shanker forwarded to Gopalakrishnan a single-slide PowerPoint slide

19    deck titled "framework2," a single-slide PowerPoint slide deck titled "Framework for Value

20    Proposition Articulation," and a four-page Word document titled "Framework for articulating the

21    value prop."  Shanker Decl. ¶¶ 56(a)–(d).

22         Shanker claims that he did not use or intend for the recipients to use any EWB proprietary,

23    confidential, or trade secret information contained in these documents.  *Id.*  Instead, he declares that he

24    forwarded the "Recommended On-Boarding Flow V5" document as an example of the type of

25    high-level framework he sought for the fintech business he was contemplating at the time, the

26    "EWB–Digital Bank Fraud Management Approach Project Update" document as an example of a

27    "very basic issue" digital banks have to consider, the Velo Product Roadmap as an example of a

28    product roadmap, and the "framework2" slide and four-page document to gauge Gopalakrishnan's

United States District Court
Northern District of California

4

interest in working with Shanker on the fintech venture.  *Id.*  According to Shanker, he turned over all

EWB-issued devices in May 2019 and returned all of EWB's documents in April 2021.  Dkt. No.

64-11 ("Lawson Decl.") ¶¶ 4–9.  Shanker says that he is no longer in possession of any EWB

property.  Shanker Decl. ¶¶ 58–63.

## II.   PROCEDURAL HISTORY

The FAC asserts five causes of action against Defendants: (1) misappropriation of trade

secrets in violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, against

Defendants; (2) breach of contract against Shanker; (3) breach of the implied covenant of good

faith and fair dealing against Shanker; (4) breach of fiduciary duty against Shanker; and (5)

violation of CAL. BUS. & PROF. CODE § 17200 against Defendants ("UCL claim").

EWB categorizes its confidential, proprietary, and trade secret information into three broad

categories relating to: (1) the Velo software and platform; (2) EWB's proprietary anti-fraud and

anti-money laundering systems ("AML") and Bank Secrecy Act and Anti-Money Laundering

("BSA/AML") policies; and (3) EWB's strategic planning documents.  Specifically, EWB asserts

that Defendants misappropriated the following confidential, highly proprietary, and trade secret

information ("EWB's Confidential Information"):

1.  "Velo Product Roadmap (Trade Secret 1).  EWB's Velo Product Roadmap (the "Velo Roadmap") is a critical part of the Velo platform development.  The Velo Roadmap provides a detailed master plan that communicates the product vision, strategy, priorities, and product release milestones of the Velo platform, as well as a planned phased rollout and target launch dates of product features over time. . . .

2.  Digital Banking Architecture Diagrams (Trade Secret 2).  EWB's Digital Banking Architecture Diagrams illustrate a high level overview of the design, processes, interactions, constraints, and boundaries of the data and system components required to support EWB's online banking, identity management, access management, and cloud deployment platforms.  EWB's Architecture Diagrams are highly proprietary documents that illustrate a blueprint of how EWB has uniquely designed various systems, software, and hardware to interact with each other to support their products. . . .

3.  Target State Architecture (Trade Secret 3).  EWB's Target State Architecture details the structure, mechanisms, and procedures through which the Velo platform plans to achieve its intended goals for account onboarding and Know Your Customer ("KYC") checks. . . .

4.  Velo Algorithms and Processes (Trade Secret 4).  EWB's Velo

Algorithms and Processes provide the proprietary steps by which users of the Velo platform are enabled to open an NRA account and disclose the codes and processes for EWB to monitor instances of fraud, anti-money laundering, and Bank Secrecy Act requirements, as well as flag transactions and users for suspicious activity. . . .

5.   Velo Value Proposition and Roadmaps (Trade Secret 5).  EWB's Velo Value Proposition and Roadmaps disclose the subsequent procedures EWB should perform in the event an alert event is triggered, such as whether to send the user a text message, email, or phone call and the steps a customer takes in deciding whether to open a bank account, including Velo's proprietary responses to those steps. . . .

6.   Velo Product Features and Designs (Trade Secret 6).  EWB's Velo Product Features and Designs describe the appearance of the Velo dashboard, as well as provide an analysis of mobile banking application users and various Velo features.  The Velo Product Features and Designs also disclose information on how EWB plans to allocate resources, describes the team leads responsible for creating requirements for various features of Velo, and discloses the number and names of cross-functional teammates responsible for developing those features."

7.   "Fraud Prevention Systems (Trade Secret 7). . . . EWB's innovative fraud prevention systems and policies were designed to detect and mitigate fraud and ensure compliance with all relevant laws and regulations. . . .

8.   Decision Trees (Trade Secret 8). . . . [D]ecision trees [] disclose the decision-making processes by which customers (U.S. residents and NRAs) can be identified and onboarded for financial accounts and fraud can be flagged, scored, and addressed on the Velo platform. . . . Based on the outcome of the BSA and fraud screening checks, the decision trees indicate whether the customer can continue onto the next step in the Velo product, or the customer should be blocked from continuing without some manual intervention (if applicable) by the EWB team.  EWB's decision trees also map out whether flags for fraudulent activity should stop a transaction immediately, allow the activity to continue, or require the manual review of EWB's fraud department. The decision trees describe the effort needed to ensure that EWB is minimizing its fraud risk related to a given fraud BSA check. These decision trees also indicate which team or third party service is best suited to execute the check, and whether additional communication to the customer is required if the process is properly executed. . . .

9.   KYC Review Strategies (Trade Secret 9).  A KYC check is the process by which EWB identifies and verifies a customer's identity when opening an account. . . .

10.   Compliance Policies to Combat Fraud and Money Laundering (Trade Secret 10).  EWB's compliance policies to combat fraud and money laundering consist of the internal policies that were developed by EWB and its consultants to effectively monitor, detect, and mitigate regulatory risks in connection with digital onboarding and transactions made on the Velo platform."

11.   "Digital Banking Expense Forecasts (Trade Secret 11).  EWB's Digital Banking Expense Forecasts detail EWB's vendors and pricing for

6

projects and staffing to develop and build aspects of the Velo platform. EWB's Digital Banking Expense Forecasts disclose EWB's plans for present and future development of projects related to the Velo platform. . . .

12. <u>Target Customer Strategies (Trade Secret 12)</u>. EWB's Target Customer Strategies disclose EWB's internal strategies for targeting customers. EWB's Target Customer Strategies also disclose what future products and features and processes EWB plans to implement in the next iterations of its Velo platform to continue attracting and engaging customers. . . .

13. <u>Analytic Layer Strategy (Trade Secret 13)</u>. EWB's Analytics Layer Strategy illustrates the methods and processes by which EWB determines, tracks, and measures user acquisition and engagement, as well as compares such user acquisition and engagement against benchmarks and use cases. . . .

14. <u>Internal Strategies to Enhance Customer Experience (Trade Secret 14)</u>. EWB's Internal Strategies to Enhance Customer Experience were developed by EWB to provide steps EWB should take to ensure customers remain satisfied with their user experience while simultaneously ensuring the appropriate level of fraud protection and risk mitigation is in place. . . .

15. <u>Internal Strategies to Align EWB Credit Card Strategies with EWB Customer Profiles (Trade Secret 15)</u>. EWB's Internal Strategies to Align EWB Credit Card Strategies with EWB Customer Profiles were developed by EWB to devise methods by which EWB would identify customers that are eligible for various credit card products, how EWB would rate the credit-worthiness of customers, whether a customer was eligible for a secured or unsecured EWB credit card, and the credit line EWB would extend to customers. This proprietary information can be leveraged by a competitor to develop a similar strategy and compete for the same target customers for credit card products near-term or in the future. . . .

16. <u>Peer Bank Competitive Landscape (Trade Secret 16)</u>. EWB's Peer Bank Competitive Landscape compiles, organizes, and highlights EWB's market research data on EWB's competitors and the banking industry overall, enabling EWB to compare the strengths and weaknesses of its position across a number of metrics, including total asset growth over time, return on assets growth, return on earnings growth, and its profitability mix."

*See* Dkt. No. 51 ("PI Mot.") at 5–7; Dkt. No. 51-1 ("Nambiar Decl.") ¶¶ 22(a)–(f), 23(a)–(f) (explaining EWB's Trade Secrets 1–6 and 11–16); Dkt. No. 51-2 ("Mao Decl.") ¶¶ 15(a)–(d) (explaining EWB's Trade Secrets 7–10).

On April 5, 2021, Shanker produced an email dated May 7, 2020 from his Aeldra email account to Aeldra's COO's email account, concerning the Velo Product Roadmap. After receipt of this email, on April 14, 2021, EWB began negotiations for a stipulated preliminary injunction

with Shanker's counsel.  Dkt. No. 75-23 ("Kang Reply Decl.") ¶¶ 6–9.  The parties failed to come to an agreement.   On May 19, 2021, EWB filed this present motion for preliminary injunction seeking to (1) prohibit Defendants from using, disclosing, distributing, or retaining EWB's confidential, proprietary, or trade secret information; (2) prohibit Shanker from violating his obligations under the confidentiality and settlement agreements with EWB; and (3) direct Defendants to immediately return to EWB all of EWB's confidential, proprietary, or trade secret information in their possession, custody, or control.  PI Mot. at (i).

On July 14, 2021, the hearing for the motion for preliminary injunction and motion to dismiss took place.  An hour and a half before the hearing, Aeldra's counsel emailed EWB's counsel an Excel file titled, "Aeldra 2020 Product Roadmap," which includes documents such as the Velo Product Roadmap, one of EWB's trade secrets.  Dkt. No. 93 ("July 14, 2021 Hearing Transcript") at 4:21–5:1.  One tab of the Aeldra 2020 Product Roadmap copies what is stated in the Velo Product Roadmap (Trade Secret 1) and specifically references Velo multiple times.  *Id.* at 5:2-5.  Another tab is a copy of a document titled, "Velo Product Features and Designs" (Trade Secret 6), which includes each Velo product feature and design, and a third tab includes other documents such as the Velo Value Proposition and Roadmaps (Trade Secret 5).  *Id.* at 5:6–15.  EWB has identified these documents as part of its trade secrets.  *Id.*  Shanker also filed an amended declaration, explaining that he was aware of the Aeldra 2020 Product Roadmap but pointing out that the metadata for the Aeldra 2020 Product Roadmap shows that it was created at 4:44 pm on April 24, 2020, and was last modified a minute later, at 4:45 pm, on the same day.  Dkt. No. 86 ("Shanker Amended Decl.") ¶ 56(e).  Shanker claims that he did not use this document to develop Aeldra.  *Id.*

## LEGAL STANDARD

## I.   PRELIMINARY INJUNCTION

Federal Rule of Civil Procedure 65 governs preliminary injunctions and temporary restraining orders.  FED. R. CIV. P. 65.  A preliminary injunction may be issued if a plaintiff establishes: (1) likelihood of success on the merits; (2) likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an

1  injunction is in the public interest. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20

2  (2008). "Injunctive relief [is] an extraordinary remedy that may only be awarded upon a clear

3  showing that the plaintiff is entitled to such relief." *Id.* at 22. The Ninth Circuit has held that

4  "'serious questions going to the merits' and a hardship balance that tips sharply toward the

5  plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test

6  are also met." *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011).

7  ## II.     RULE 12(B)(6)

8          Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint

9  if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to

10 dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its

11 face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when

12 the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant

13 is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation

14 omitted). This standard is not akin to a probability requirement, but there must be "more than a

15 sheer possibility that a defendant has acted unlawfully." *Id.* While courts do not require

16 "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to

17 relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

18         In deciding whether the plaintiff has stated a claim upon which relief can be granted, the

19 court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the

20 plaintiff. *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is

21 not required to accept as true "allegations that are merely conclusory, unwarranted deductions of

22 fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir.

23 2008). If the court dismisses the complaint, it "should grant leave to amend even if no request to

24 amend the pleading was made, unless it determines that the pleading could not possibly be cured

25 by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000). In making

26 this determination, the court should consider factors such as "the presence or absence of undue

27 delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments,

28 undue prejudice to the opposing party and futility of the proposed amendment." *Moore v. Kayport*

United States District Court
Northern District of California

*Package Express*, 885 F.2d 531, 538 (9th Cir. 1989).

<div align="center">DISCUSSION</div>

## I.      EVIDENTIARY OBJECTIONS

As a preliminary matter, Defendants object to EWB's evidence in EWB's motion for preliminary injunction and reply brief on the grounds that the evidence constitutes new evidence improperly raised for the first time on reply, the evidence constitutes improper expert opinions in violation of Federal Rule of Evidence 701, or the evidence lacks the necessary foundation or relevance to be admissible in violation of the Federal Rules of Evidence.  Dkt. No. 77 at 1–4; *see also* Dkt. No. 64 ("PI Opp.") at 5 n.5, 17 n.3.  All of Defendants' evidentiary objections are OVERRULED.

The objections based on the Federal Rules of Evidence are OVERRULED because "the Federal Rules of Evidence do not strictly apply to preliminary injunction proceedings." *Disney Enterprises, Inc. v. VidAngel, Inc.*, 224 F. Supp. 3d 957, 966 (C.D. Cal. 2016), *aff'd,* 869 F.3d 848 (9th Cir. 2017) (citing *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988) (en banc)).  "[T]his does not mean that evidentiary issues have no relevance to [a preliminary injunction] proceeding." *Id.* (citation omitted).  "Such issues, however, properly go to weight rather than admissibility." *Id.*  Accordingly, I may consider inadmissible evidence in the context of a preliminary injunction but "will give each piece of evidence the weight it deserves." *See Newmark Realty Cap., Inc. v. BGC Partners, Inc.*, No. 16-CV-01702-BLF, 2018 WL 2573192, at *3 (N.D. Cal. Apr. 16, 2018).

As for the remaining objections, courts in the Ninth Circuit have found that "[n]ew evidence submitted as part of a reply is improper." *Morris v. Guetta*, 2013 WL 440127, at *8 (C.D. Cal. Feb. 4, 2013).  "[I]t is improper because the opposing party is deprived of the opportunity to respond." *Id.* n. 8.  But where evidence is "submitted in direct response to proof adduced in opposition to a motion" it is not "new." *Edwards v. Toys "R" Us*, 527 F. Supp. 2d 1197, 1205 n.31 (C.D. Cal. 2007) (citing *Terrell v. Contra Costa Cnty.*, 232 Fed. Appx. 626, 629 n.2 (9th Cir. 2007)).  Defendants argue that the evidence is new evidence improperly raised for the first time on reply.  Dkt. No. 77.

All of Defendants' objections based on "new evidence" are OVERRULED because EWB submitted the evidence in direct response to Defendants' arguments in their opposition. For example, the paragraphs and accompanying exhibits contested in the Nambiar Reply Declaration are direct responses to Shanker's arguments that, among other things, EWB failed to identify any part of the documents that were trade secrets and only identified general systems that every company has. *Compare* Dkt. No. 75-1 ("Nambiar Reply Decl.") ¶¶ 7–9, 29(a)–29(e) and Exhibits A–E *with* PI Opp. at 13–16. The Defendants' objections to the Teo Declaration are OVERRULED because the Teo Declaration is in direct response to Shanker's assertions about the March 2019 meetings and Shanker's dispute that he worked at EWB until April 30, 2019. *See* Dkt. No. 75-17 ("Teo Decl."); Shanker Decl. ¶¶ 17–31. For the same reasons, the objections to the Arif Declaration and accompanying exhibits are also OVERRULED. *See* Dkt. No. 75-14 ("Arif Decl.").

Likewise, Defendants' objections to the Mao Reply Declaration are OVERRULED. Paragraph 6 directly responds to Defendants' request for judicial notice of the agreement between EWB and the Federal Reserve Bank and Defendants' argument about the agreement in their opposition. *See* Dkt. No. 75-7 ("Mao Reply Decl.") ¶ 6; Dkt. No. 65 ("Request for Judicial Notice"); PI Opp. at 14. Paragraphs 12–20 and 22–24 directly respond to Defendants' argument that Aeldra created its anti-fraud systems by using a template. Mao Reply Decl. ¶¶ 12–20, 22–24; PI Opp. at 8. Paragraphs 34–38 are direct responses to Defendants' argument that EWB's decision trees are not proprietary trade secret information but simply identifications of a general system. PI Opp. at 15. Further, Defendants' objections to the Wang Reply Declaration are also OVERRULED. Paragraphs 2–4 and the accompanying Exhibits A–C, which relate to the inventory of documents Shanker allegedly forwarded to himself around March 13, 2019, are not new evidence. *See* Wang Reply Decl. ¶¶ 2–4; Dkt. Nos. 75-20–75-22. In EWB's motion for preliminary injunction, Wang declared that Shanker "forwarded forty highly confidential EWB documents relating to Velo to his personal email accounts" and specified a few of those documents. PI Mot. at 10; Dkt. No. 51-4 ("Wang Decl.") ¶¶ 7–8.

## II.    MOTION FOR PRELIMINARY INJUNCTION

EWB moves for preliminary injunction to enjoin Defendants from, among other things, continuing to use or disclose its trade secrets.  It argues that a preliminary injunction is appropriate because (1) it is likely to succeed on the merits of its DTSA, breach of contract, breach of fiduciary, and UCL claims; (2) it will likely suffer irreparable injury if the Defendants are allowed to continue using its trade secrets; (3) the balance of hardships strongly favors a preliminary injunction because it will only prevent defendants from engaging in competition that is unlawful; and (4) a preliminary injunction is in the public interest in upholding confidentiality and nondisclosure agreements between employers and their employees and protecting intellectual property rights.

Defendants oppose EWB's motion on a variety of grounds.  They argue that EWB is unlikely to succeed on the merits because the information it asserts cannot constitute trade secrets, Defendants did not use the information, and EWB did not adequately protect the information. They further assert that EWB cannot show irreparable harm, the balance of hardships tips in their favor, and the public interest disfavors a preliminary injunction.

### A.    Likelihood of Success on the Merits

#### 1.    Misappropriation of Trade Secrets Claim Against Defendants

EWB asserts that it is likely to succeed on the merits because Defendants misappropriated its trade secrets in violation of the DTSA.  PI Mot. at 12–17.  Defendants contend that EWB fails to sufficiently allege any trade secrets, Defendants did not use any of its alleged trade secrets, and EWB did not take reasonable steps to protect its information.  PI Opp. at 10–20.

Under the DTSA, the term "trade secret" means "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans . . .  designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized . . ."  so long as the owner "has taken reasonable measures to keep such information secret" and "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value

United States District Court
Northern District of California

from the disclosure or use of the information."  18 U.S.C. § 1839(3).  A prima facie case for

misappropriation of trade secrets requires a plaintiff to show: "(1) the plaintiff owned a trade

secret, (2) the defendant acquired, disclosed, or used the plaintiff's trade secret through improper

means, and (3) the defendant's actions damaged the plaintiff." *Brocade Commc'ns Sys., Inc. v. A10*

*Networks, Inc.*, No. 10-CV-03428-LHK, 873 F. Supp. 2d 1192, 1212 (N.D. Cal. 2012), *on*

*reconsideration in part*, No. 10-CV-3428-PSG, 2012 WL 12925716 (N.D. Cal. July 8, 2012); *see*

*also* 18 U.S.C. § 1839(5).  In addition, many courts require a showing that (4) "the owner has

made 'reasonable' efforts to keep secret" the information and (5) the secret "derives independent

economic value . . . from not being generally known to other persons."  *Beckton, Dickinson & Co.*

*v. Cytek Biosciences, Inc.*, No. 18-CV-00933-MMC, 2018 WL 2298500, at *2 (N.D. Cal. May 21,

2018) (quotation marks omitted); *see also* 18 U.S.C. § 1839(5).

<div align="center">

**a.**      **Whether EWB Fails to Identify Trade Secrets with Sufficient Particularity**

</div>

First, Defendants contend that EWB fails to allege information that can be considered a

trade secret.  Although a "plaintiff need not 'spell out the details of the trade secret,'" *Autodesk,*

*Inc. v. ZWCAD Software Co.*, No. 14-CV-01409-EJD, 2015 WL 2265479, at *5 (N.D. Cal. May

13, 2015), the plaintiff must "describe the subject matter of the trade secret with sufficient

particularity to separate it from matters of general knowledge in the trade or of special knowledge

of those persons skilled in the trade . . . [and] must clearly refer to tangible trade secret material

instead of referring to a system which potentially qualifies for trade secret protection."

*InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 658 (9th Cir. 2020) (internal

citations, quotation marks, and alterations omitted).

Defendants assert that EWB's "catch-all descriptions" suggest that each of its sixteen

alleged trade secrets "identifies nothing more than a general system known to those persons

skilled in the trade."  PI Opp. at 13.  In support, Defendants assert that during Shanker's

employment, "neither opening U.S. bank accounts for non-resident aliens or onboarding

customers through a digital application were novel concepts."  Shanker Decl. at 9.  Although this

may be true, it does not counter EWB's claim that Velo was the first of its kind when it launched

<div align="center">13</div>

United States District Court
Northern District of California

1    in May 2019 as a digital product to allow non-U.S. citizens to open new U.S. bank accounts

2    without a social security number or an in-person bank visit.  PI Mot. at 1.  Defendants' own

3    December 2020 press release supports EWB's argument.  *See* Aeldra Press Release.  The press

4    release lauded Aeldra's "first-of-a-kind capability" to "offer[] seamless borderless banking

5    enabling global citizens to open a U.S. bank account in 5 minutes on their mobile from overseas,"

6    which would "open[] up a $20B market."  *Id.* at 21.  EWB also argues that "[w]hile other

7    companies may have their own product plans, expense forecasts, and policies and procedures, they

8    do not have EWB's Confidential Information" as Defendants do.  Dkt. No. 75 ("PI Reply") at 9.

9    Because EWB asserts that its trade secrets all relate to this novel technology, Velo, I find that

10   EWB alleges its trade secrets with sufficient particularity such that Defendants can "ascertain at

11   least the boundaries within which the secret lies."  *Alta Devices, Inc. v. LG Elecs., Inc.*,

12   No. 18-CV-00404-LHK, 343 F. Supp. 3d 868, 881 (N.D. Cal. 2018) (citation omitted).

13          As a result, I reject Defendants' arguments against each of EWB's trade secrets.

14   Defendants first contend that EWB's Velo Product Roadmap and the Digital Banking Architecture

15   documents are not trade secrets because having a plan or a vision strategy is not a trade secret, and

16   neither is a generalized assertion that an architecture exists.  PI Opp. at 13–14.  In addition,

17   Defendants contend that the Velo Product Roadmap does not have value because it was created

18   three years ago and therefore it is not a trade secret.  PI Opp. at 13.  Defendants are wrong.  Courts

19   have found that roadmaps related to confidential technology can constitute trade secret

20   information.  *See Alta Devices*, 343 F. Supp. 3d at 881 (finding that plaintiff sufficiently pleaded

21   trade secrets, such as tool roadmaps of a specific technology).  Even though the Velo Product

22   Roadmap is three years old, EWB asserts that it would be useful to Defendants in developing their

23   upcoming offerings of "U.S. brokerage accounts, no-FICO credit cards, and no-FICO mortgages."

24   PI Reply at 9.  Moreover, the Digital Banking Architecture documents include "specific

25   components, layers, functions, and even the vendors retained to perform certain functions" to

26   illustrate EWB's "uniquely designed" systems.  PI Reply at 10; Nambiar Decl. ¶ 22(b).

27          Defendants also contend that EWB's anti-fraud and AML systems—e.g., the financial

28   crime controls for a digital bank and EWB's decision trees—are not trade secrets because every

                                                      14

1   U.S. bank is required by law to have anti-fraud and AML policies and EWB does not identify any

2   unique aspect of its policy.  PI Opp. at 14.  But as EWB asserts, Defendants conflate anti–fraud

3   and AML policies with "highly proprietary" anti-fraud and AML systems, which are not mandated

4   by the government and are "the culmination of thousands of hours of work" by EWB.  PI Reply at

5   10; *see* Dkt. No. 50-10 ("Financial Crime Controls for Digital Banking").

6        Finally, Defendants assert that EWB's strategic planning documents—e.g., Digital

7   Banking Expense Forecasts and internal customer strategies—do not constitute trade secrets

8   because 2018 price lists are presumably publicly available and have no value as two-year-old

9   documents and EWB fails to identify any aspect of its customer strategy that should be subject to

10   trade secret protection.  PI Opp. at 15–16.  The Digital Banking Expense Forecasts "detail EWB's

11   vendors and pricing for projects and staffing" including "the compensation and pricing EWB is

12   expending for these roles."  Nambiar Decl. ¶ 23(a).  Courts have held that the types of documents

13   that EWB alleges are trade secrets constitute trade secrets at the preliminary injunction stage.  *See,*

14   *e.g.*, *Cutera, Inc. v. Lutronic Aesthetics, Inc.*, 444 F. Supp. 3d 1198, 1206 (E.D. Cal. 2020)

15   (finding that "price and cost information, including current manufacturing and vendor costs, labor

16   costs, overhead, profit margins, [and] employee salaries" is "also likely a protectable trade

17   secret."); *Arthur J. Gallagher & Co. v. Tarantino*, No. 20-CV-05505-EMC, 498 F. Supp. 3d 1155,

18   1172 (N.D. Cal. 2020) (finding that "strategies regarding client policy structuring," "client

19   retention and renewal" to be trade secrets and sufficiently pleaded).

20        Accordingly, I find that the trade secrets have been adequately identified, especially in

21   light of the specific circumstances in this case, i.e., technology related to the Velo product.

22        **b.      Whether Defendants Misappropriated EWB's Trade Secrets**

23        Then the question is whether Defendants misappropriated EWB's trade secrets.  EWB

24   argues that Shanker admits to acquiring and forwarding various documents containing EWB's

25   trade secrets to third parties, for the purposes of building Aeldra.  *See, e.g.*, Shanker Decl.

26   ¶ 56(a)–(d).  Defendants counter that EWB's misappropriation of trade secrets claim fails because

27   (1) third parties, not EWB's confidential proprietary information, supply all the aspects of

28   Aeldra's business; (2) there is no damage—Aeldra and Velo operate in two separate markets and

United States District Court
Northern District of California

are fundamentally different; and (3) EWB failed to take reasonable steps to maintain secrecy.  PI Opp. at 10–17.

Defendants contend that Aeldra's platform contains none of EWB's information because third parties such as Blue Ridge Bank, FS Vector, and i2c supply all aspects of Aeldra's business. PI Opp. at 10.  For example, Defendants argue that Aeldra could not have used the Velo Product Roadmap because it licenses its mobile banking application from i2c.  *Id.* at 11.  But the Aeldra 2020 Product Roadmap copies what is stated in the Velo Product Roadmap, identified as EWB's Trade Secret 1, and specifically references Velo multiple times.  Dkt. No. 93 at 5:2-5.  Other tabs of the Aeldra 2020 Product Roadmap include a document titled, "Velo Product Features and Designs" and other documents such as the Velo Value Proposition and Roadmaps.  *Id.* at 5:6–15. EWB has identified these documents as Trade Secrets 5 and 6.  *Id.*  Although Shanker claims that he did not use these documents to create Aeldra, the Aeldra 2020 Product Roadmap undermines his argument that Aeldra could not have used any of EWB's trade secrets.  *See* Shanker Amended Decl. ¶ 56(e).

Further, EWB argues that Aeldra is not an "off-the-shelf" application as evidenced by the 54-page Transaction Processing Services Agreement ("TPSA") between Aeldra and i2c, which "details a customized enterprise package for transaction processing services and a license for a configurable mobile banking application based upon product specifications and requirements provided by Aeldra."  PI Reply at 6; *see* Dkt. No. 63 ("i2c Agreement").  i2c also acknowledges Aeldra's proprietary information and trade secrets.  PI Reply at 7; Dkt. No. 63.  Moreover, Aeldra's Press Release identified the relationship between Aeldra and i2c as a "partnership" and "collaboration" to bring a "first-of-a-kind capability" of creating a global platform to address a $20 billion market.  Aeldra Press Release at 1.  As a result, Aeldra was likely not created by simply licensing an "off-the-shelf" stock application from i2c.  PI Reply at 7.

Defendants also assert that because Aeldra is not a bank, it partnered with Blue Ridge Bank and because Aeldra is subject to Blue Ridge Bank's BSA/AML policies, Aeldra could not have used EWB's BSA/AML policies.  *Id.* at 10–11.  Similarly, Defendants claim that they could not have used EWB's onboarding process because Aeldra employs FS Vector's compliance

templates.  *Id.*

Again, Defendants conflate EWB's anti-fraud and AML systems with its policies.  PI Reply at 8.  According to EWB, Defendants' risk analysis processes sound similar to EWB's anti-fraud and AML systems and a company cannot build an anti-fraud system from a template alone.  PI Reply at 4; Mao Reply Decl. ¶¶ 12–20, 22–24 .  Moreover, EWB points out that the creation of such systems was not an enumerated service in the agreement between Aeldra and FS Vector.  *See* Dkt. No. 65-17 ("Mulcahey Decl.") ¶ 12.  Consequently, Defendants' inability to use EWB's trade secret policies does not negate EWB's argument that Defendants misappropriated its trade secrets to create similar anti-fraud and AML systems, which are key to Velo's success.  *See* PI Mot. at 3–4; PI Reply at 8.

Second, Defendants assert that there is no evidence of actual damage or threatened harm because Aeldra and Velo operate in two separate markets and are fundamentally different products.  PI Opp. at 7, 12.  Defendants state that Aeldra only has capacity to offer its services to Indian citizens whereas EWB's offerings focus on Chinese national users.  PI Opp. at 7.  According to Defendants, EWB's alleged trade secrets would be of no use to Defendants because Aeldra is substantially different from Velo; for example, unlike Velo, Aeldra's mobile application is not capable of onboarding customers who are citizens of China, Hong Kong, or Taiwan.  *Id.*  But Defendants' own statements refute its argument.  In May 2021, Aeldra issued a press release announcing that it planned to "target customers in BRICS-Plus countries (Brazil, Russia, India, China, South Africa, and others) who have cross-border banking needs in the United States."  Kang Reply Decl., Ex. 3.

Further, there are a number of similarities between the two products.  Both target the global NRA market and are in the Indian market, although EWB only offers Velo in India through a business-to-business corporate partnership presently.  Nambiar Reply Decl. ¶¶ 27–28.  Both Velo and Aeldra obtain their customer identity verification information databases from the same vendor.  Dkt. No. 74-29 ("Wang Reply Decl., Ex. B").  Shanker forwarded a copy of the agreement between EWB and the vendor on the day he was terminated.  *Id.*  It is also likely that Aeldra has a similar onboarding process as Velo.  That Aeldra's application redirects a customer

United States District Court
Northern District of California

1    to open an account through its web browser, unlike Velo, is an immaterial difference.  *See* PI

2    Reply at 3.  Shanker admits that before Aeldra's launch he forwarded EWB's Onboarding

3    Customer Experience deck—which included mockups of Velo's onboarding process—to Aeldra's

4    COO, who had no prior experience with digital banking.  *See* Shanker Decl. ¶ 56(b).  As a result,

5    Defendants' likely misappropriated EWB's trade secrets, which "allowed Aeldra to gain an

6    unlawful head start advantage" in this novel market and "threaten EWB's market position."  PI

7    Reply at 8.

8         Third, Defendants contend that EWB's misappropriation of trade secrets claim fails

9    because EWB did not take reasonable steps to maintain secrecy.  PI Opp. at 16.  According to

10   Defendants: (1) the confidentiality agreements, which EWB requires every employee to sign, do

11   not constitute contracts; (2) EWB's network is not secure, as evidenced by Velo employees

12   routinely emailing documents to their personal accounts; and (3) the doors were regularly propped

13   open without a receptionist present, creating public access to areas where EWB posted Velo's

14   value proposition, app design, and account-opening procedures on the walls.[1]  *Id.*  But courts have

15   found that similar steps—e.g., confidential agreements, secure networks, and physical key card

16   security measures—were reasonable to maintain secrecy.  *See, e.g.*, *Cutera*, 444 F.Supp. 3d at

17   1206–07 (finding that an employee handbook confidentiality provision was adequate to show

18   plaintiff's reasonable efforts to maintain secrecy); *Pyro Spectaculars N., Inc. v. Souza*, 861 F.

19   Supp. 2d 1079, 1091 (E.D. Cal. 2012) (finding that although plaintiff's "security practices are not

20   perfect and these issues can certainly be explored further in discovery and at trial," for the

21   purposes of the motion, the plaintiff had made reasonable efforts to maintain secrecy through

22   security measures and confidentiality agreements).

23

24   ---

[1] Defendants also assert that EWB's anti-fraud policies are more public than most because its
25   policies were mandated by the government in 2015 and filed with the Federal Reserve Bank in
     2016 ("Written Agreement").  PI Opp. at 14.  Defendants request that I take judicial notice of
26   EWB's agreement with the Federal Reserve Bank, as well as the briefing and docket report of
     EWB's ex parte application for a temporary restraining order against Rohit Mehtani in *East West*
27   *Bank v. Rohit Mehtani*, No. 19-CV-06531-LB.  Dkt. No. 65.  EWB only contends that the Written
     Agreement does not outline EWB's specific BSA/AML policies.  Dkt. No. 75-7 ("Mao Reply
28   Decl.") ¶ 6.  EWB does not oppose Defendants' request for judicial notice.  Accordingly,
     Defendants' request is GRANTED.

1    In sum and on this record, it is likely that EWB will succeed on the merits of its

2    misappropriation of trade secrets claim.

3                    **2.        Other Claims**

4            Similarly, EWB is likely to succeed on the merits of its breach of contract claim against

5    Shanker.  To state a claim for breach of a contract, a plaintiff must plead: "(1) the contract, (2)

6    plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) damage to

7    plaintiff therefrom."  *Kaar v. Wells Fargo Bank, N.A.*, No. 16-CV-01290-WHA, 2016 WL

8    3068396, at *1 (N.D. Cal. June 1, 2016) (internal quotation marks and citation omitted).

9    Defendants argue that the Confidentiality Agreements Shanker signed are not contracts because

10   there was no acceptance by EWB and no consideration.  PI Opp. at 18.  The only valid contract,

11   according to Defendants, is the June 2019 Settlement Agreement, which Shanker did not breach

12   because Shanker turned over all EWB-issued devices in May 2019 and returned all of EWB's

13   documents in April 2021.  *Id.*  In support, Defendants point to EWB's First Vice President and

14   Associate General Counsel, Louisa Wang's admission during her deposition that, "If [Shanker]

15   turned over all property belonging to the bank, then I would say he has complied with paragraph 4

16   [of the settlement agreement]."  Dkt. No. 64-15 ("Wang Depo.") at 89:1–9; *see* Wang Decl., Ex. B

17   ("Settlement Agreement") ¶ 4 ("Employee agrees that Employee has turned over or will turn over

18   to the Bank, all property belonging to the Bank . . . .").

19           But as EWB asserts, the Confidentiality Agreements likely constitute contracts; EWB's

20   acceptance was the hiring of Shanker and the consideration was Shanker's salary.  PI Reply at 11.

21   In addition, that Shanker returned all of EWB's documents in April 2021, in response to formal

22   discovery, does not preclude a finding of breach and damages.

23           In contrast, it is unlikely that EWB will succeed on the merits of its UCL claim against the

24   Defendants, absent proper amendment.  *See infra* Part III.  It is also unlikely that EWB will

25   succeed on the merits of its breach of fiduciary duty claim against Shanker.  Defendants assert that

26   the CUTSA also supersedes the breach of fiduciary duty claim.[2]  PI Opp. at 19.  EWB contends

27

28   _____

[2] The motion to dismiss the UCL claim, which discusses the supersession of the CUTSA in depth, does not concern the breach of fiduciary duty claim.  *See* Dkt. No. 57.

that there is no supersession because the breach of fiduciary claim is based on distinct facts than the ones that underlie the trade secrets claim—Shanker's development of a competing product using EWB's non-trade secret property violates his contractual agreements and duty of loyalty. PI Opp. at 12. But as established below, the CUTSA can also supersede claims involving non-trade secret information. *See infra* Part III. Regardless, I find that EWB is likely to succeed on the merits of at least its misappropriation of trade secrets and breach of contract claims.

### B. Likelihood of Irreparable Injury

The parties dispute whether absent a preliminary injunction, EWB will likely be irreparably harmed. "Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy." *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). The threat of irreparable harm must also be "immediate" to warrant preliminary injunctive relief. *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). "[A plaintiff's] long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm." *Oakland Tribune, Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985).

First, the parties dispute whether there is a presumption of harm when trade secrets are misappropriated. EWB asserts that "courts in this district have presumed that Plaintiff will suffer irreparable harm if its proprietary information is misappropriated." *Comet Techs. United States of Am. Inc. v. Beuerman*, No. 18-CV-01441-LHK, 2018 WL 1990226, at *5 (N.D. Cal. Mar. 15, 2018) (citation, quotation marks, and alteration omitted); *see* PI Mot. at 21. Defendants contend that there is no such presumption even where a likelihood of success has been established. PI Opp. at 20. They distinguish *Comet Techs.* and EWB's other cases as ones that "involve potential loss of customers," which is not the case here because "EWB is in no danger of [] losing customers to Aeldra given that the two companies operate in entirely different markets." *Id.* at 21.

The Ninth Circuit has not reached the question of whether a court may presume irreparable harm in trade secret cases. As a result, some courts have held there is no presumption and others have held there is where proprietary information is misappropriated. *See Carl Zeiss Meditec, Inc. v. Topcon Med. Sys., Inc.*, No. 19-CV-4162-SBA, 2021 WL 1186335, at *10 (N.D. Cal. Mar. 1, 2021) (finding

1    that although the Ninth Circuit has not held one way or the other "courts within this District have

2    consistently reached the conclusion that a plaintiff 'will suffer irreparable harm if its proprietary

3    information is misappropriated.'"); *but see Zendar Inc. v. Hanks*, No. 20-CV-03391-JSW, 2020 WL

4    4458903, at *5 (N.D. Cal. May 27, 2020) (finding that "the Court is not persuaded that a presumption

5    of irreparable harm is appropriate" given the Ninth Circuit's rejection of finding presumption of

6    irreparable harm in copyright infringement cases).

7        Even without presumption, however, there is likelihood of irreparable harm in this case

8    because absent a preliminary injunction, EWB will likely suffer loss of market position, loss of

9    current and prospective customers, and increased risk of further disclosure of EWB's Confidential

10    Information to third parties. *See* PI Mot. at 21–22. In trade secret cases, "[i]t is well established that

11    the loss of market position and the disclosure of trade secrets can constitute irreparable harm."

12    *WeRide Corp. v. Kun Huang*, No. 18-CV-07233-EJD, 379 F. Supp. 3d 834, 853–54 (N.D. Cal. 2019).

13    In addition, "[c]ourts concur that a defendant's ability to gain a competitive advantage through the use

14    of confidential information to develop a competing product is sufficient to constitute irreparable

15    harm." *Carl Zeiss Meditec, Inc.*, 2021 WL 1186335, at *10 (collecting cases).

16        Defendants contend that EWB fails to support its conclusory allegations regarding harm,

17    EWB's delay shows there is no threat of irreparable harm, and Defendants' ongoing remediation

18    eliminates any threat of harm. PI Opp. at 22. Contrary to Defendants' first argument, as

19    explained above, I find that EWB has sufficiently pleaded facts to support its claim that

20    Defendants' allegedly unlawful actions "jeopardized [EWB's] first to market advantage," allowed

21    Aeldra to "gain[] a competitive advantage" and receive "a head start," and caused EWB's "loss of

22    market position." PI Mot. at 20–22. Both Velo and Aeldra are competing for the same global

23    NRA market, a $20 billion dollar market. Notwithstanding the dispute over whether Velo is in the

24    same Indian market as Aeldra, Aeldra has announced plans to expand into the Chinese market as

25    well as the Brazilian and Russian markets. *See* PI Reply at 13; *see* Aeldra Press Release. As a

26    result, Aeldra is "threatening to exploit its unlawful 'head start' to take *entire global markets* from

27    EWB as it continues to expand." PI Mot. at 21 (emphasis in original). Further, EWB argues that

28    "Defendants' continued use and possession of EWB's Confidential Information substantially

United States District Court
Northern District of California

increases the risk of further disclosure." PI Mot. at 22.

Defendants point out that EWB knew about the alleged misappropriation of trade secrets since at least October 2020 when it filed the Complaint and therefore the delay shows that there is no immediate or irreparable harm. PI Opp. at 21. EWB asserts that it first obtained evidence that Defendants used EWB's Confidential Information on April 5, 2021 when Shanker produced the email forwarding EWB's Velo Product Roadmap to Aeldra's COO. PI Reply at 13. Subsequent negotiations for a stipulated preliminary injunction with Defendants failed. Kang Reply Decl. ¶¶ 6–9. Defendants argued that their ongoing remediation, i.e., identification and return of any EWB documents that might remain in Shanker or Aeldra's counsel's possession, eliminates any threat of harm. PI Opp. at 22. But Defendants already used EWB's documents while it was building the Aeldra platform, so it is not sufficient for Defendants to just return EWB's documents. Kang Reply Decl. ¶¶ 6–9. To find no likelihood of irreparable harm after a defendant returns the information it used to misappropriate the trade secrets would render laws such as the DUTSA, which seek to protect trade secrets, moot.

EWB also relies on *Waymo LLC v. Uber Techs., Inc.*, 2017 WL 2123560, at *11 (N.D. Cal. May 15, 2017), where the court rejected defendant's delay argument because plaintiff had "reasonably refrained from bringing suit until it discovered evidence indicating use" of its trade secrets. In *Waymo*, the plaintiff found evidence that defendants had downloaded confidential information in October 2016, but first received evidence that defendants had used its confidential information in December 2016. *Id.* Two months later, plaintiff filed a complaint and then two weeks later, plaintiff filed an amended complaint as well as the motion for preliminary injunction. *See* Dkt. Nos. 1, 23, 24 in *Waymo*, 2017 WL 2123560.

To be sure, the facts in this case are different. EWB filed its Complaint in October 2020, alleging that, "On information and belief, Defendant . . . intends to continue to use this confidential, proprietary, and trade secret information to unfairly create a competing alternative to the Velo platform." Compl. ¶ 39. Five months after filing the Complaint, EWB received evidence that Defendants had used EWB's Confidential Information and filed this present motion a month later in May 2021. Some courts have found that a delay even after mere suspicion of Defendants'

misappropriation implied that there was no exigent need for injunctive relief.  *See Diversified Silicone Prod. Corp. v. Elastapro Silicone Sheeting LLC*, 2020 WL 4390380, at *3 (C.D. Cal. May 19, 2020) (finding that plaintiffs' seven-month delay in bringing a preliminary injunction motion after it "at least suspected that Defendant was misappropriating their trade secrets" precluded a finding of irreparable injury).  Although delay is a factor that weighs against a likelihood of irreparable harm, the delay here does not outweigh the other evidence in support of concluding that absent a preliminary injunction, EWB will likely be irreparably harmed.

C.    **Balance of Hardships**

EWB argues that Defendants will suffer no cognizable harm from the proposed preliminary injunction, which "simply requires Defendants to comply with their contractual and legal obligations not to use EWB's confidential, proprietary, or trade secret information obtained by Shanker by virtue of his employment with EWB."  PI Mot. at 23; *see Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1077 (N.D. Cal. 2016) (balance of hardships favored granting TRO, where proposed injunction would enjoin "conduct that is already prohibited under the provisions of the Confidentiality and Non-Solicitation Agreement" and thus would "do no more than require Defendant to comply with federal and state . . . laws").

Defendants' opposition is unpersuasive.  First, Defendants contend that the proposed inunction is not narrowly tailored because EWB fails to specify its trade secrets with particularity or identify what obligations Shanker should be enjoined from violating.  PI Opp. at 24–25.  As explained above, I find that EWB has described with sufficient particularity what its trade secrets are.  *See supra* Part II(A)(1)(a).  Defendants also assert that EWB's delay caused Aeldra to invest time and resources creating its platform and onboarding customers and therefore an injunction would damage Aeldra and its customers.  PI Opp. at 23.  But any hardship that Defendants may experience is attributable to its own conduct in using EWB's confidential and proprietary information in the course of creating Aeldra.  *See Carl Zeiss Meditec*, 2021 WL 1186335, at *11 (concluding that the balance of hardships tips in favor of preliminary injunction because "whatever hardship [defendant] may experience is attributable to its own conduct in using [plaintiff's] confidential and proprietary information in the course of preparing [the competing

product] for market.").

And in fact, Defendants assert that the preliminary injunction will not harm them.  During the July 14, 2021 hearing, Aeldra's counsel confirmed that if Aeldra was prohibited from using trade secrets it would not be impacted because Aeldra does not use EWB materials.  Dkt. No. 93 at 8:11-21.  Likewise, Shanker's counsel also confirmed that Shanker has met all of his obligations under the Confidentiality and Settlement Agreements, returned all of EWB's property, and is not using or possessing EWB's trade secrets.  *Id.* at 13:8-23.  Aeldra and Shanker's counsel feared that the preliminary injunction would require Aeldra to shut down its business.  *Id.* at 9:4-19.  Shutting down Aeldra is outside the scope of the proposed preliminary injunction, and during the hearing EWB's counsel confirmed that EWB was not requesting an injunction requiring Aeldra to shut down its platform.  *Id.* at 16:11-15.

Defendants also point out that their remediation demonstrates their good faith, especially in light of their assertion that they sought to return all documents in August 2020 but EWB failed to respond and filed the Complaint instead.  PI Opp. at 23.  Further, Defendants assert that EWB's refusal to enter a stipulated injunction shows that EWB's goal is not to safeguard trade secrets but to use a vague injunction "as a weapon against Aeldra."  PI Opp. at 23.  But Defendants' return of EWB's documents does not alleviate the harm that would be caused by Defendants' continued use of EWB's information in Aeldra.

Because Defendants have not identified any harm that would result from the proposed injunction, the proposed injunction will at a minimum preserve the status quo while the record is better developed to demonstrate whether Defendants' representations are accurate.  The injunction will protect EWB's intellectual property rights from irreparable injury if not.  I conclude that the balance of hardship tips in favor of EWB.

### D.    Public Interest

It is well-established that "[c]ourts often find that the public has a strong interest in protecting intellectual property rights" and in this case, "an injunction would also promote fair and lawful competition in an emerging market."  *WeRide*, 379 F. Supp. 3d at 854.  In addition, "[t]he public interest is served by the protection of trade secrets and the enforcement of contractual commitments

United States District Court
Northern District of California

1    made by an employee to his or her employer." *Carl Zeiss Meditec*, 2021 WL 1186335, at \*11.

2           Defendants contend that the proposed injunction weighs against public interest because it

3    "would have a significant harmful effect on all of Aeldra's customers" for whom Aeldra is "their only

4    means of transacting business" in their bank accounts.  PI Opp. at 24 (citing *Stormans, Inc. v. Selecky*,

5    586 F.3d 1109 (9th Cir. 2009) (concluding that a proposed injunction which would enjoin any

6    pharmacy or pharmacist, as opposed to only the plaintiffs, "clearly reached non-parties and implicated

7    issues of broader public concern that could have public consequences.")).  But as EWB emphasizes,

8    Defendants do not cite to any evidence that Aeldra's customers would be harmed.  PI Reply at 15.

9    Defendants' conclusory statements do not outweigh the strong public interest in protecting trade

10   secrets and enforcing employee-employer contracts.

11          **E.      Whether a Bond Is Required**

12          EWB asserts that it should not be required to post a bond because "the proposed injunction

13   simply prohibits Defendants from using EWB's Confidential Information, which they were never

14   entitled to do in the first place" and because EWB has made a strong showing regarding its

15   likelihood of success on the merits.  PI Mot. at 24.  Defendants oppose and contend that pursuant

16   to Federal Rule of Civil Procedure 65(c), a court can issue a preliminary injunction "only if the

17   movant gives security in an movant that the court considers proper to pay the costs and damages

18   sustained by any party found to have been wrongfully enjoined or restrained."  PI Opp. at 25; *see*

19   FED. R. CIV. P. 65(c).  The Ninth Circuit, however, has recognized that Rule 65(c) "invests the

20   district court with discretion as to the amount of security required, *if any*" and therefore the

21   "district court may dispense with the filing of a bond when it concludes there is no realistic

22   likelihood of harm to the defendant from enjoining his or her conduct."  *Jorgensen v. Cassiday*,

23   320 F.3d 906, 919 (9th Cir. 2003) (emphasis in original).

24          EWB relies on *Schein* and *Comet Techs.* in support of its argument that no bond is

25   required.  *See* PI Mot. at 24; PI Reply at 15.  Both cases involve situations where there was no

26   likelihood of harm.  In *Comet Techs.*, the plaintiff company sought to prohibit its former employee

27   from disclosing its confidential information and sought the return of its stolen information.  *Comet*

28   *Techs.*, 2018 WL 1990226, at \*1.  The court concluded that no bond was required because there

was no realistic likelihood of harm—the former employee was never entitled to disclose or use the information he took from the plaintiff, the temporary restraining order would not cause any damage to the former employee's legitimate business, and the employee agreed in her contract with the plaintiff that the plaintiff may seek injunctive relief without a bond. *Id.* at *6. Similarly, in *Schein*, the plaintiff employer sought to enjoin its former employee from using, sharing, or accessing any of the data its employee took. *Schein*, 191 F.Supp. 3d. at 1072. The court found that no bond was required because the temporary restraining order would not cause damage to the employee's legitimate business and the employee's agreements with the employer allowed the employer to seek injunctive relief without a bond. *Id.* at 1074.

In this case, although there is no indication that EWB's agreements with Shanker allowed EWB to seek injunctive relief without a bond, Defendants concede that there is no realistic likelihood of harm because they continue to assert that they do not use EWB's Confidential Information in Aeldra. Dkt. No. 93 at 8:11–9:19. Accordingly, no bond is required because it does not appear that Defendants will do anything in response to the injunction. But if Defendants realize the injunction will require Defendants to act, now or in the future, I will allow Defendants to file a declaration within seven days of that realization, explaining what kind of bond they think is inappropriate. EWB will have seven days to respond.

## III.    AELDRA'S MOTION TO DISMISS EWB'S UCL CLAIM

The parties dispute whether California's Uniform Trade Secrets Act ("CUTSA") supersedes EWB's UCL claim. *See* Mot. at 3. Under California law, it is generally accepted that the "CUTSA provides the exclusive civil remedy for conduct falling within its terms and supersedes other civil remedies based upon misappropriation of a trade secret." *Silvaco Data Sys. v. Intel Corp.*, 184 Cal.App.4th 210, 236 (2010), *disapproved on other grounds by Kwikset Corp. v. Superior Court*, 51 Cal.4th 310 (2011) (internal quotation marks omitted) (citing Cal. Civ. Code § 3426.7(a), (b)). In addition, a majority of courts in this district have held that the "CUTSA supersedes claims based on the misappropriation of information that does not satisfy the definition of trade secret under the CUTSA." *Barker v. Insight Glob., LLC*, No. 16-CV-07186-BLF, 2017 WL 10504692, at *4 (N.D. Cal. Nov. 21, 2017) (collecting cases). But if there is "some other

26

provision of positive law" that grants "a property right in that [non-trade secret] information" or an allegation of wrongdoing that is "materially distinct from the wrongdoing alleged in a CUTSA claim" then the CUTSA does not supersede the claim. *Waymo LLC v. Uber Techs., Inc.*, No. 17-CV-00939-WHA, 256 F. Supp. 3d 1059, 1063 (N.D. Cal. 2017). "Although a few courts have held otherwise, most of the contrary decisions were issued before the California Court of Appeal's *Silvaco* decision or failed to review *Silvaco* at all." *Barker v. Insight Glob., LLC*, 2017 WL 10504692, at \*4. The California Supreme Court has yet to weigh in on the CUTSA's scope.

There are two main policy rationales for the extension of the CUTSA to information that does not constitute trade secrets. *See U.S. Legal Support, Inc. v. Hofioni*, 2013 WL 6844756, at \*9 (E.D. Cal. Dec. 20, 2013). First, if the CUTSA "did not supersede these claims, then misappropriation of non-trade secrets would justify a broader range of civil remedies than misappropriation of trade secrets," even though "non-trade secrets seem to be both less valuable and subject to fewer protective measures than trade secrets." *Id.* (citing *SunPower Corp. v. SolarCity Corp.*, No. 12-CV-00694-LHK, 2012 WL 6160472 (N.D. Cal. Dec.11, 2012)). Second, information that does not qualify for trade secret protection "and is not otherwise made property by some provision of positive law, belongs to no one, and cannot be converted or stolen." *Id.* (quoting *Silvaco*, 184 Cal.App.4th at 239 n. 22). I agree with these policy rationales and will follow the majority approach, as I have before. *See Prostar Wireless Grp., LLC v. Domino's Pizza, Inc.*, 16-CV-05399-WHO, 360 F. Supp. 3d 994, 1006 (N.D. Cal. 2018), *aff'd*, 815 F. App'x 117 (9th Cir. 2020) (holding that to survive supersession, plaintiff's claims must "allege wrongdoing that is materially distinct from the wrongdoing alleged in a CUTSA claim").

EWB's main argument against supersession is that its UCL claim is independently based on Aeldra's theft and misuse of EWB's non-trade secret confidential information.[3] Dkt. No. 67

---

[3] EWB also points out that Defendants cannot contend in their opposition to EWB's motion for preliminary injunction that EWB does not assert any trade secrets but assert in this motion that EWB's UCL claim is solely predicated on the alleged misappropriation of trade secrets. Opp. at 5–6. EWB mischaracterizes Defendants' arguments. It is consistent to argue, as Defendants have here, that EWB fails to identify any trade secrets and that the CUTSA supersedes its UCL claim based on non-trade secret confidential information. EWB's reliance on *Think Vill.-Kiwi, LLC v. Adobe Sys., Inc.*, No. 08-CV-04166-SI, 2009 WL 902337, at \*2 (N.D. Cal. Apr. 1, 2009) is misplaced. Although the court acknowledged that defendants' "current argument—that the 'trade

("Opp.") at 5.  As explained above, EWB's argument fails unless there is a provision of positive law, which grants a property right in the non-trade secret information or if the theft of confidential information is not based on the same nucleus of facts as the trade secrets claim.  *See Prostar Wireless Grp.*, 360 F. Supp. 3d at 1006; *Barker*, 2017 WL 10504692, at *4.  EWB's UCL claim alleges, "Defendants' wrongful conduct . . . constitutes unlawful, unfair, and/or fraudulent business acts and practices.  Such acts and practices include, but are not limited to, misappropriating EWB's confidential, proprietary, and trade secret information and with respect to Shanker, breaching his fiduciary duty owed to EWB."  FAC ¶ 77.  EWB's breach of fiduciary duty claim, against Shanker only, alleges,

> "As Senior Vice President of Project Management, Defendant owed EWB a fiduciary duty to maintain the trade secrets and other confidential and proprietary information of EWB in strict confidence, and to use those trade secrets and confidential information only for the benefit of EWB.  Instead, Defendant breached his fiduciary duty to EWB by sending EWB's trade secrets and confidential information to his personal email account for his own personal use in direct competition with EWB."

FAC ¶¶ 72–73.

As a result, the CUTSA supersedes EWB's UCL claim.  EWB's UCL claim is based on the same nucleus of facts as EWB's misappropriation of trade secrets claim—i.e., the theft and use of EWB's trade secrets and confidential and proprietary information.  *See* FAC ¶¶ 46–55.  EWB does not allege a wrongdoing under the UCL that is distinct from the wrongdoing under its trade secrets claim.  Moreover, EWB's FAC fails to plead a provision of positive law that is distinct from trade secrets law, which grants a property right in the non-trade secret information.

EWB argues that the question of supersession is more appropriate for summary judgment than a motion to dismiss because resolving the question requires a factual analysis of "what the confidential or proprietary information is, how it was converted, and the property interest alleged to have harmed as a result of that conversion."  Opp. at 4 (quoting *Bryant v. Mattel, Inc.*, 2010 WL

---

secret' allegations are preempted by CUTSA—contradicts their primary defense that [plaintiff's] information does not constitute 'trade secrets,'" the court followed a similar analysis as the one here:  that plaintiff's claims will not survive unless plaintiff added common law claims for misappropriation and breach of confidence.

3705668, at *22 (C.D. Cal. Aug. 2, 2010)).  But courts in this district have held that it is appropriate to analyze a CUTSA supersession at the pleadings stage.  *See, e.g.*, *Waymo*, 256 F. Supp. 3d at 1063–64 (dismissing plaintiff's UCL claim, which alleged that defendants had misappropriated plaintiff's "confidential and proprietary" information); *SunPower*, 2012 WL 6160472, at *15 (finding it appropriate to dismiss plaintiff's claims at the pleading stage rather than postpone the issue until summary judgment because plaintiff had "failed to allege facts sufficient for the Court to conclude that [it] had a property interest in the non-trade secret information, or that this interest is qualitatively different from the rights conferred by CUTSA.").  Because EWB's FAC "fails to plead that some other provision of positive law qualitatively different from trade secret law grants [EWB] a property right in its 'confidential information,' CUTSA supersedes [EWB's] Section 17200 claim based on misappropriation of said information . . . ." *Waymo*, 256 F. Supp. 3d at 1064.

EWB also requests that I grant EWB leave to amend to allege that its UCL claim is independently based on the theft of non-trade secret information and specify the non-trade secret information that Defendants stole if its UCL claim warrants dismissal.  Mot. at 7–8.  Aeldra is correct that such an amendment would be futile because it would be subject to dismissal under the same precedent.  Dkt. No. 72 ("Reply") at 4–5.  But if EWB would like to amend its FAC to assert that its non-trade secret confidential information is made properly by some law other than the CUTSA or that its non-trade secret claims are predicated on something other than the misappropriation of its trade secrets, it may.

## IV.   MOTIONS TO SEAL

The parties have filed three administrative motions to seal.  *See* Dkt. Nos. 50, 61, 74.  A party seeking to seal court records must overcome a strong presumption in favor of the public's right to access those records.  *See Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1096 (9th Cir. 2016), *cert. denied sub nom. FCA U.S. LLC v. Ctr. for Auto Safety*, 137 S. Ct. 38 (2016). The Ninth Circuit imposes the "compelling reasons" standard on most motions to seal, which requires a court to explain its findings "without relying on hypothesis or conjecture."  *Ctr. for Auto Safety*, 809 F.3d at 1096–97.  The Ninth Circuit has explained that examples of "compelling

United States District Court
Northern District of California

1    reasons" include "the use of records to gratify private spite, promote public scandal, circulate

2    libelous statements, or release trade secrets." *Kamakana v. City & Cty. of Honolulu*, 447 F.3d

3    1172, 1179 (9th Cir. 2006). A "good cause" exception applies to some nondispositive motions,

4    including those related to discovery. *Ctr. for Auto Safety*, 809 F.3d at 1097. But in this case,

5    because EWB's motion for preliminary injunction is a nondispositive motion that is "more than

6    tangentially related to the merits" of this case, the "compelling reasons" standard applies. *See id.*

7    at 1101.

8           The first motion to seal portions of the motion for preliminary injunction and certain

9    exhibits is GRANTED. *See* Dkt. No. 50. I have previously granted the sealing of the confidential

10   employee salary and compensation information found in the motion and Exhibits A and B to the

11   Wang Declaration. *See* Dkt. Nos. 20, 43, 48. The sealing of EWB's financial investment and

12   budget for its Velo product in EWB's motion and paragraph 9 of the Nambiar Declaration is also

13   warranted as it concerns financial information, which if made public, could economically harm

14   EWB's business. The sealing of social security information in Exhibit A is also warranted. EWB

15   seeks the sealing of portions of Exhibit 1 to the Kang Declaration, Exhibit A to the Mao

16   Declaration, and Exhibit F to the Nambiar Declaration. Dkt. No. 50 at 4–5. These exhibits

17   contain documents titled, "Framework for Value PropositionArticulation.ppt," "Framework for

18   articulating the value prop," "framework 2," "Recommended On-Boarding Flow V5," "Velo

19   Product Roadmap," "Financial Crime Controls for Digital Bank," and "MVP1 and MVP2 (NRA)

20   Future State Workflow Differences" ("Attachments"). I have previously granted the sealing of the

21   Velo Product Roadmap. *See* Dkt. No. 43 at 9. The other Attachments should also be sealed

22   because they concern EWB's proprietary, confidential, and trade secret information, which if

23   made public, would harm EWB's business by, e.g., allowing competitors to replicate EWB's

24   development of Velo without expending the resources it invested. *See* Dkt. No. 50 at 4–5.

25          The second motion to seal portions of Defendants' opposition and certain exhibits is

26   GRANTED in part and DENIED in part. EWB's request to seal lines 2:18-19 and 7:26–8:1 in the

27   opposition is GRANTED because it concerns EWB's confidential onboarding processes, which if

28   made public would harm EWB's competitive standing. Dkt. No. 68 at 2. But EWB does not

request the sealing of lines 1:15, 13:14, 13:18, 14:4, 14:8, 14:15, 15:5, 15:11, 15:12, 15:16, 15:20, 16:2, or 18:13.  *See id.*  Defendants' request to seal the highlighted language on pages 2 and 7–8 is GRANTED because the language concerns confidential licensing and business information regarding the terms, practices, and relationships with Blue Ridge Bank, FS Vector, and i2c.  *See* Dkt. No. 61 at 1.  Defendants' request to seal the highlighted language on pages 5 is GRANTED because it concerns Shanker's employee compensation.  But Defendants' request to seal the highlighted language on pages 22–23 is DENIED because it is unclear how an individual could "attack Aeldra's systems for the purposes of information" if the general description of Shanker's devices are known (e.g., laptops, iCloud etc.).  The cases Defendants cite do not support this basis for sealing.  *See Exeltis USA Inc. v. First Databank, Inc.*, No. 17-CV-04810-HSG, 2020 WL 2838812, at *1 (N.D. Cal. June 1, 2020); *Aya Healthcare Services, Inc. v. AMN Healthcare, Inc.*, 2020 WL 1911502, at *4 (S.D. Cal. Apr. 20, 2020).  For the same reasons, Defendants' requests to seal portions of the Considine Declaration and the Lawson Declaration is DENIED.  *See* Dkt. No. 61 at 4.  The clerk shall UNSEAL Dkt. Nos. 61-13 and 61-17.

Defendants' request to seal the highlighted language on pages 6 and 11 of its opposition is GRANTED because it reflects the terms of the TPSA between Aeldra and i2c, which contains a mandatory confidentiality clause.  *See* Dkt. No. 71 ¶ 5.  Defendants' request to seal the highlighted language on pages 1, 2, 5, 6, and 11 is GRANTED because these redacted portions reflect the terms of the August 13, 2020 Program Management Agreement ("PMA") between Aeldra and Blue Ridge Bank, which contains a mandatory confidentiality clause as well as competitively sensitive information regarding Blue Ridge Bank's processes, relationships, and information regarding Blue Ridge Bank's BSA/AML/OFAC/KYC procedures.  Dkt. No. 69 ¶ 5.  The parties shall file a new redacted copy of Defendants' opposition.

Further, the sealing of portions of paragraphs 2 and 4–8 of the Bentley Declaration is GRANTED because the highlighted language also reflects the terms of the TPSA and competitively sensitive information regarding how i2c's software works, its specific relationship with Aeldra, and its proprietary approach to customer solutions, all of which if made public, would jeopardize i2c's competitive standing.  *Id.* ¶¶ 2–3.  As a result, Exhibit H of the Shanker

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Declaration should also be sealed because it is a copy of the TPSA.  *Id.* ¶ 4.  Defendants' and Blue

2    Ridge Bank's request to seal portions of paragraphs 4, 8, and 10 of the Taxin Declaration is also

3    GRANTED because the highlighted language also reflects the terms of the PMA.  Dkt. No. 69 ¶¶

4    2–3.  Public disclosure of this information would harm Blue Ridge Bank's competitive standing.

5    *Id.*  Paragraphs 8 and 10 also reflect competitively sensitive information regarding Blue Ridge

6    Bank's processes, relationships, and information regarding Blue Ridge Bank's

7    BSA/AML/OFAC/KYC procedures.  *Id.*  For the same reasons, Exhibit G to the Shanker

8    Declaration, a copy of the PMA, should be sealed.

9          Defendants and FS Vector request to seal paragraphs 11–15 in the Mulhaney Declaration.

10   *See* Dkt. No. 61 at 2.  All of the highlighted language, except for lines 3–4 in paragraph 11, should

11   be sealed because it concerns FS Vector's confidential information related to its client solutions to

12   banking regulations, which if disclosed would harm FS Vector's business.  *Id.*  The proposed

13   sealing of lines 3–4 of paragraph 11 in the Mulhaney Declaration is DENIED because it is not

14   confidential information that Blue Ridge Bank provides the banking services for Aeldra, as

15   evidenced by Defendants not sealing such language in its opposition.  *See* Dkt. No. 64 at 5.

16         Defendants' request to seal paragraphs 4, 5, and 7–9 of the Gopalakrishnan Declaration is

17   GRANTED because the material reflects Aeldra's confidential business strategies and

18   information, which if made public would harm Aeldra's business.  *See* Dkt. No. 61 at 4.  But EWB

19   does not request the sealing of paragraph 13 of Gopalakrishnan Declaration.  *See* Dkt. No. 68.

20   The parties shall submit a new redacted copy of the Gopalakrishnan Declaration with only the

21   portions of paragraphs 4, 5, and 7–9 redacted.

22         EWB's request to seal portions of paragraphs 15, 27, 53, and 56(a) of the Shanker

23   Declaration is GRANTED because the language concerns EWB's confidential onboarding

24   processes, digital banking platform, fraud management techniques, and verification of customer

25   identities, which if made public would harm EWB's business.  Dkt. No. 68 at 3.  Defendants'

26   request to seal portions of paragraphs 42 and 45–48 of the Shanker Declaration is GRANTED

27   because the material reflects the terms of the TPSA and PMA.  Dkt. No. 61 at 2.  Defendants'

28   request to seal highlighted language in paragraph 4 is also GRANTED because it reflects

1    Shanker's wages.  *Id.*  The request to seal paragraphs 41 and 53–54, is GRANTED because the

2    material reflects Aeldra's confidential business and strategy information related to its onboarding

3    approach and fraud prevention, which if made public would harm Aeldra's competitive standing.

4    *Id.*  The request to seal the portion of paragraph 59 is DENIED for the same reasons above

5    regarding Shanker's electronic devices.  Because EWB does not request that the portion of

6    paragraph 56(b) should be redacted, the parties shall file a new redacted copy of the Shanker

7    Declaration removing the redaction from paragraphs 56(b) and 59.

8           The third motion to seal portions of EWB's reply and certain exhibits is GRANTED.  The

9    portions of EWB's reply that disclose EWB's financial investment and budget information in its

10   Velo product should be sealed for the reasons above.  The highlighted language on page 5 of

11   EWB's reply that concern the names of vendors and the specific demographic data EWB considers

12   when evaluating markets, warrants sealing because it concerns confidential information, which if

13   made public, would cause harm to EWB's competitive standing.  Dkt. No. 74 at 3.  The portions

14   of the Mao Reply Declaration and its accompanying Exhibits A–F which concern confidential

15   information about EWB's non-public vendors, non-public consultants, and "know your customer"

16   and onboarding processes should be sealed because if made public, it would harm EWB's

17   business.  Dkt. No. 74 at 2–3.  Paragraphs 28–29 and 37 of the Mao Reply Declaration should also

18   be sealed because it concerns the "Financial Crime Controls For Digital Bank" document and

19   Aeldra's confidential business information, which I granted the sealing of above.

20          The parties should take notice that there are portions of EWB's reply, which are

21   unredacted, but concern confidential licensing and business information regarding the terms,

22   practices, and relationships with Blue Ridge Bank, FS Vector, and i2c that I have granted the

23   sealing of above.  *See, e.g.*, PI Reply at 7.

24          EWB also seeks the sealing of portions of the Nambiar Reply Declaration and

25   accompanying Exhibits A–E.  Dkt. No. 74 at 3–4.  EWB's request to seal paragraphs 5 and 26 of

26   the Nambiar Reply Declaration is GRANTED because the highlighted language concerns

27   non-public identities of EWB's vendors for Velo and proprietary information of the Velo Product

28   Roadmap, which I previously ordered sealed.  *Id.*  In addition, paragraphs 14 and 15 should also

United States District Court
Northern District of California

33

be sealed because it concerns the terms of Aeldra's confidential agreement with i2c, which if made public would harm Aeldra's competitive position.  The proposed sealing of portions of Exhibits A–E to the Nambiar Declaration is GRANTED because the highlighted language concerns confidential financial information, vendor information, customer strategies, "know your customer" and onboarding functions, and the Attachments I ordered sealed above, which if made public, would harm EWB's competitive position.  *See id.*

Further, the request to seal portions of Exhibits A–C to the Wang Reply Declaration is GRANTED because the highlighted language concerns the names of EWB's non-public vendors, confidential contracts with a Velo vendor, and EWB's confidential fraud prevention measures, which if made public would harm EWB's competitive standing.  *See id.* at 4.  Similarly, the request to seal paragraph 2 of the Arif Reply Declaration and paragraph 4 of Exhibit A to the Teo Reply Declaration is GRANTED because the highlighted language concerns EWB's confidential cost information about its data security operations and employee compensation, which would harm EWB's business if disclosed.  *Id.*

This resolves the motions at Dkt. Nos. 50, 61, and 74.  The parties should e-file revised redacted versions of the documents at issue, redacting only information allowed by this Order, within 14 days.

## CONCLUSION

For the reasons explained above, EWB's motion for preliminary injunction is GRANTED.

1. Aeldra and Shanker, their officers, agents, servants, employees, attorneys, and all other persons who are in active concert or participation with them, and who receives actual notice of this order, whether or not in the United States, are RESTRAINED AND ENJOINED from using, disclosing, distributing, or retaining any of EWB's confidential, proprietary, or trade secret information obtained by Defendant Shanker from or by virtue of his employment with EWB, including any Velo software/platform, pricing, customer, marketing, anti-fraud/anti-money laundering system/policy information ("EWB's Confidential Information");

2. Defendant Shanker is RESTRAINED AND ENJOINED from violating his obligations

under the confidentiality and settlement agreements with EWB, including without limitation, the terms of his agreements that prohibit the use or disclosure of EWB's Confidential Information;

3. Defendants Shanker and Aeldra shall deliver immediately to EWB all copies of documents, materials, and other media, whether in paper form or in an electronic medium, containing EWB's Confidential Information that Defendants have in their possession, custody, or control.

EWB's request for no bond is also GRANTED. If Defendants believe that this injunction will require Defendants to act, Defendants may file a declaration within seven days of developing that belief, stating what kind of bond they think is inappropriate and why. EWB may respond within seven days of Defendants' declaration.

Aeldra's motion to dismiss EWB's UCL claim is GRANTED with leave to amend. EWB may amend its complaint within 30 days, after I have heard its pending motion to amend the rest of its complaint.

**IT IS SO ORDERED.**

Dated: July 22, 2021

William H. Orrick
United States District Judge

United States District Court
Northern District of California

35