Ekwan E. Rhow - State Bar No. 174604
  erhow@birdmarella.com
Grace W. Kang - State Bar No. 271260
  gkang@birdmarella.com
Jonathan M. Jackson - State Bar No. 257554
  jjackson@birdmarella.com
Aharon B. Kaslow - State Bar No. 322769
  akaslow@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California  90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Attorneys for Plaintiff East West Bank

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**

| | |
|---|---|
| EAST WEST BANK, a California corporation,<br><br>                Plaintiff,<br><br>        vs.<br><br>SUKEERT SHANKER, an individual; AELDRA FINANCIAL INC., a Delaware corporation; VENKAT GOPALAKRISHNAN, an individual; BLUE RIDGE BANK, N.A., a Virginia corporation; FS VECTOR LLC, a Delaware corporation; and DOES 1-7,<br><br>                Defendants. | Case No. 3:20-cv-07364-WHO<br><br>**SECOND AMENDED COMPLAINT FOR:**<br><br>1. **MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF THE DTSA**<br>2. **BREACH OF CONTRACT**<br>3. **BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**<br>4. **BREACH OF FIDUCIARY DUTY**<br>5. **VIOLATION OF CAL. BUS. & PROF. CODE SECTION 17200**<br><br>**DEMAND FOR JURY TRIAL** |

*REDACTED VERSION OF DOCUMENT FOR PUBLIC FILING*

Plaintiff East West Bank ("EWB" or "Plaintiff"), by and through its attorneys, asserts this Complaint against Sukeert Shanker, Aeldra Financial Inc., Venkat Gopalakrishnan, Blue Ridge Bank, N.A., FS Vector LLC and Does 1-7 (collectively, "Defendants"), as set forth below.

## PARTIES

1.      Plaintiff East West Bank is a California corporation organized and existing under the laws of the state of California with its principal place of business in Pasadena, California.  East West Bank is a wholly-owned subsidiary of East West Bancorp, Inc., which is a publicly held corporation.

2.      On information and belief, Defendant Sukeert Shanker ("Shanker") is an individual and a resident of Belmont, California.

3.      On information and belief, Defendant Aeldra Financial Inc. ("Aeldra") is a Delaware corporation organized and existing under the laws of the state of Delaware with its principal place of business in Palo Alto, California.

4.      On information and belief, Defendant Venkat Gopalakrishnan is an individual and a resident of Potomac, Maryland.

5.      On information and belief, Defendant Blue Ridge Bank, N.A. ("Blue Ridge Bank") is a Virginia corporation organized and existing under the laws of the state of Virginia with its principal place of business in Martinsville, Virginia.  On information and belief, Blue Ridge Bank is a wholly-owned subsidiary of Blue Ridge Bankshares, Inc., which is a publicly held corporation.

6.      On information and belief, Defendant FS Vector LLC is a Delaware corporation organized and existing under the laws of the state of Delaware with its principal place of business in Washington, D.C.

7.      Plaintiff does not know the true names or capacities, whether individual, associate, corporate, or otherwise, of the defendants sued as Does 1-7 (the "Doe Defendants") and therefore, sues the Doe Defendants under such fictitious names.  Plaintiff will amend the Complaint to show the true names and capacities of the Doe Defendants when and as Plaintiff ascertains the same. Plaintiff is informed and believes that each of the Doe Defendants acted in concert or privity with the Defendants and that Plaintiff's injuries were proximately caused by the Doe Defendants' acts and omissions.

**JURISDICTION AND VENUE**

8.      This Court has original subject matter jurisdiction for this action pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836(c) and 28 U.S.C. § 1331.  This Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367.

9.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) and personal jurisdiction exists because certain Defendants are residents of California and reside and do business in this judicial district; the actions complained of took place in this judicial district; and Plaintiff has suffered harm in this district.

**FACTUAL BACKGROUND**

A.      **East West Bank and its Trade Secret and Confidential and Proprietary Information**

10.     EWB is a premier, full-service commercial bank with over 120 locations in key cities in the U.S. and Greater China.  EWB has approximately $50 billion in assets.

11.     Critical to EWB's success are the valuable trade secrets and confidential and proprietary information that EWB has spent substantial time, money, and other resources to develop and maintain.  These trade secrets and other proprietary confidential information ("Confidential Information")  include but are not limited to: (1) the Velo by East West Bank ("Velo") software and platform designed to offer a global digital banking service that allows consumers worldwide to access premium products and services offered by EWB, including EWB's confidential and proprietary decision trees and algorithms developed by EWB and used in connection with the Velo platform; (2) EWB's proprietary and highly confidential methods and procedures that it developed internally for combatting fraud and money laundering and for strict compliance with the strict federal banking laws and regulations; and (3) EWB's highly confidential and detailed strategic planning documents.

12.     EWB takes reasonable steps to maintain the confidentiality of its trade secrets and confidential information.

13.     EWB requires all of its incoming employees who may, as a part of their employment at EWB, have access to confidential and/or trade secret information, sign a confidentiality

agreement.

14.     EWB also requires all of its outgoing employees who may, as a part of their employment at EWB, have had access to confidential and/or trade secret information sign a confidentiality agreement during their exit interview.

15.     These confidentiality agreements require the employee to agree not to use the confidential information that belongs to EWB for any purpose other than for EWB's benefit.

16.     These confidentiality agreements also prohibit an employee from removing or making copies of any company records, reports or documents without prior management approval.

**B.     East West Bank's Proprietary Velo Software and Platform**

17.     EWB has developed a new next-generation global digital banking service called "Velo by East West Bank."  Velo, a mobile banking app, is designed to provide easy access to consumers worldwide, including a new account opening platform for nonresident non-U.S. citizens ("NRAs").  One issue that often arises with NRAs opening bank accounts in the United States is that it is often difficult to verify an applicant's identity.  The Velo platform provides a solution for, and assists with this process, which is often referred to in the banking industry as "onboarding."

18.     Velo was the first digital bank to offer fully automated NRA onboarding services to open U.S. bank accounts through a mobile application in real-time, without requiring a social security number or an in-person branch visit.

19.     Velo's innovative onboarding systems and processes developed by EWB and used in connection with the Velo platform are highly proprietary, and EWB derives a substantial economic benefit from these systems and processes not being generally known to the public.

20.     EWB requires any employees who have access to this information as part of their job responsibilities to agree to keep this information as confidential and to use this information only in the scope of their employment for EWB.

21.     EWB's Confidential Information related to the product development of the Velo software and platform include but is not limited to:

a.     EWB's Velo Product Roadmap.  EWB's Velo Product Roadmap is a critical part of the Velo platform development.  The Velo Product Roadmap provides a detailed

master plan that communicates the product vision, strategy, priorities, and product release milestones of the Velo platform, as well as a planned phased rollout and target launch dates of product features over time.  EWB's Velo Product Roadmap is a highly proprietary, internal organization document, which took significant time and effort for EWB's cross-functional team members to create, prioritize, and signoff on what features of the Velo platform would be resourced to develop, and when those features would be targeted to launch.  The value of a competitor having access to the Velo Product Roadmap is high, because it gives detailed insight into EWB's long-term and near-term strategy for the Velo platform and would allow a competitor to replicate and release a similar product and feature set.

    b.   <u>EWB's Digital Banking Architecture Diagrams and Documents</u>.  EWB's digital banking architecture diagrams and documents provide a system overview of the design, processes, and procedures required to support EWB's digital banking, identity management, access management, and cloud deployment platforms. These documents provide a blueprint for how EWB designed its systems, software, and hardware to interact with each other for the Velo platform and details the product and technical requirements to build each step of the Velo onboarding process. Accessing these documents would allow a competitor to leverage this information and enable an engineering team to replicate the Velo platform onboarding method and bypass the time and effort in the design, vendor, and technology selection for the competitor's own product development process.

    c.   <u>Velo Product Features, Designs, and Customer Experience Documents</u>.  EWB's Velo product features, designs, and customer experience documents detail the features, designs, customer experience research, onboarding flows, and event triggers and alerts developed by EWB in connection with the Velo platform.  These documents also disclose the procedures that should be performed in the event an alert event is triggered, such as whether to send the user a text message, email, or phone call and the steps a customer takes in deciding whether to open a bank account, including

Case No. 3:20-cv-07364-WHO

Velo's proprietary responses to those steps.  A competitor with access to these documents could use the information contained therein to design and develop a competitor product while saving significant time, effort, and resources.

**C.    East West Bank's Internal and Highly Proprietary Regulatory Compliance Trade Secret Information**

22.    EWB has strong policies and procedures in place to guard against fraud and money laundering.  In addition, EWB must comply with a number of strictly enforced federal banking laws and regulations including but not limited to the Bank Secrecy Act (BSA).  These banking laws and regulations are designed to protect against fraud and money laundering activities.

23.    EWB has invested a significant amount of time, money, resources, and effort in developing internally, very strong and innovative compliance policies, methods, and procedures for combatting fraud and money laundering and for strict compliance with these federal banking laws and regulations. EWB, for example, employs a number of banking regulatory experts who specifically study and develop innovative, unique, and highly effective strategies for EWB to comply with its regulatory requirements and to minimize EWB's exposure to fraud and attempted money laundering. EWB memorializes these proprietary methods, policies, and procedures and instructs and trains its employees to fully implement and enforce these proprietary methods, policies, and procedures as part of their job duties and responsibilities, for the benefit of EWB and its customers.

24.    EWB considers these independently-derived procedures and methods to be trade secret and highly confidential and proprietary information. EWB gains significant commercial benefit by its policies and procedures not being generally known. A competitor could gain a significant advantage if it had access to EWB's methods, policies, and procedures, as it would allow the competitor to take advantage of the substantial resources that EWB has spent developing the standards, policies, and procedures in order to comply with strict federal regulations and to avoid fraud and attempted money laundering.  A competitor could gain an unfair competitive advantage by accessing and using these proprietary methods, policies, and procedures without having to spend the time and financial resources to hire experts in the field who understand the strict and extensive

regulatory framework to develop these innovative strategies for the competitor.

25.    In addition, EWB would be irreparably harmed by third parties learning of its confidential methods to detect fraud and money laundering. Knowledge of EWB's specific methods and procedures could allow nefarious actors to more easily attempt to circumvent the safeguards that EWB has put in place to prevent them from committing fraud and money laundering.

26.    EWB requires any employees who have access to this information as part of their job responsibilities to agree to keep this information as confidential and to use this information only in the scope of their employment for EWB.

27.    EWB's Confidential Information related to its BSA, Anti-Money Laundering ("AML"), and Know Your Customer ("KYC") systems, processes, policies, and procedures include but is not limited to:

    a.    Decision Trees.    EWB invested substantial time and resources to develop its proprietary decision trees that disclose EWB's internal and proprietary decision-making processes by which customers (U.S. residents and NRAs) can be identified and onboarded for new accounts in connection with the Velo platform.    EWB developed these decision trees to trigger compliance checks at every step of the customer's onboarding process.    Based on the outcome of the BSA and fraud screening checks, the decision trees indicate whether the customer can continue onto the next step in the onboarding process, or whether the customer should be blocked from continuing without some manual intervention by EWB.    EWB's decision trees also map out whether flags for fraudulent activity should stop a transaction immediately, allow the activity to continue, or require the manual review by EWB. The decision trees describe the effort needed to ensure that EWB is minimizing its fraud risk related to a given fraud BSA check.    These decision trees also indicate which team or third party service is best suited to execute the check, and whether additional communication to the customer is required if the process is properly executed.    These decision trees are the result of substantial research and development, internal analysis and effort, and collaboration of numerous cross-

functional departments and consultants. A competitor would save significant time and expense if it were to use and/or replicate EWB's decision trees to design and develop a competitor product and thereby diminish EWB's competitive advantage.

   b.  <u>Financial Crime Controls for Digital Bank</u>.  This document sets forth various internal and proprietary BSA, AML, KYC, and fraud strategies and solutions for resolving financial crime-related risks associated with onboarding NRA customers.  It identifies key risks related to onboarding NRA customers and discloses EWB's screening questions to assess the riskiness of NRA customers.  It also details the key metrics of EWB's "straight through processing method" that allows for fraud and money laundering prevention while minimizing the amount of manual review required by EWB's employees and includes a benchmark analysis of competitors.  This document would be incredibly valuable to a competitor seeking to launch a similar product and feature set, because it provides a roadmap for how to plan the control measures depending on the risk level of the target customers, without having to assess the complex fraud and money laundering risk environment directly.

**D.    East West Bank's Proprietary Strategic Planning Documents**

28.    EWB develops and maintains proprietary and highly confidential and detailed financial strategic planning documents, including but not limited to new business ventures (such as credit card initiatives), business plans, staffing levels, and marketing analytics.  As a publicly traded company, knowledge of non-public strategic planning documents could be used to gain an unfair advantage or for insider trading.

29.    Information such as the strategic planning documents that EWB has developed would significantly aid a competitor in setting up a new service that competes with Velo or EWB itself as a whole.

30.    Given the highly sensitive nature of this information, only a very limited number of EWB employees have access to this information.  EWB requires any employees who have access to this information as part of their job responsibilities to agree to keep this information as confidential and to use this information only in the scope of their employment for EWB.

31.    EWB's Confidential Information related to its strategic planning documents for the Velo platform include but is not limited to:

a. Target Customer Strategies.  EWB's Target Customer Strategies disclose EWB's internal strategies for targeting customer segments and its plans for future product features and versions to attract new customers. Accessing EWB's strategies enables a competitor to gain insight into EWB's plans to reach and acquire its target customer segments and leverage go to marketing plans that EWB has internally created and held proprietary for the launch of the Velo platform.

b. Digital Banking Expense Forecasts.  EWB's Digital Banking Expense Forecasts detail EWB's vendors and pricing for projects and staffing to develop and build aspects of the Velo platform. EWB's forecasts disclose EWB's plans for present and future development of projects related to the Velo platform. If a competitor gained access to these documents, the competitor could take advantage of the expected internal and external team size and composition required to develop similar product and feature sets, as well as the compensation and pricing EWB is expending for these roles.

**E.    Shanker's Employment and Misappropriation of EWB's Trade Secrets**

32.    Shanker was hired by EWB as a "Chief Operating Officer – Digital Banking" on December 22, 2017, his last day of work was on March 13, 2019, and he remained on EWB's payroll until April 30, 2019.

33.    On December 22, 2017, Shanker signed a confidentiality agreement and agreed not to use the confidential information that belongs to EWB for any purpose other than for EWB's benefit. He also agreed to not remove or make copies of any company records, reports or documents without prior management approval. A copy of this fully executed confidentiality agreement is attached as **Exhibit A**.

34.    During Shanker's time at EWB, he was a part of the development team for the Velo software application.  As part of the scope of his employment and job responsibilities, Shanker had access to a significant amount of confidential and trade secret information relating to the Velo

software application, including its algorithms, decision trees, feature updates, and unreleased modules/functionality along with EWB's BSA compliance materials, and EWB's proprietary strategic planning documents.

35.    As a Chief Operating Officer of EWB, Shanker owed EWB a fiduciary duty.

36.    During his exit interview following his termination from EWB, Shanker signed a second confidentiality agreement, again confirming and agreeing not to use the confidential information that belongs to EWB for any purpose other than for EWB's benefit. He also once again agreed to not remove or make copies of any company records, reports or documents without prior management approval. A copy of this signed confidentiality agreement, which was signed on May 2, 2019, is attached as **Exhibit B**.

**F.    Shanker's Confidential Settlement Agreement And Release of Claims With East West Bank**

37.    Around the time of his departure, a dispute arose between Shanker and EWB regarding the amount of money that Shanker was owed as part of his compensation package. After his departure, Shanker and East West Bank entered into a confidential "Settlement Agreement and Release of Claims." ("Settlement Agreement") A copy of this Settlement Agreement is attached as **Exhibit C**.

38.    As part of this Settlement Agreement, Shanker agreed in Paragraph 4 that "Employee agrees that Employee has turned over or will turn over to the Bank, all property belonging to the Bank, including but not limited to documents concerning the Bank's customer and personnel matters, any and all of the Bank's files, tapes, documents, keys, credit cards, telephone cards, books, software, passwords, equipment, manuals, tools and written materials."

39.    Shanker also agreed in paragraph 7 of the Settlement Agreement to release all claims that he may have against EWB whether known or unknown.

40.    As consideration for entering into the Settlement Agreement, EWB paid Shanker ███████ .

41.    Shanker was represented by counsel during the negotiation of the Settlement Agreement. On information and belief, the terms of the agreement were explained to him by counsel,

and Shanker entered into the agreement with full knowledge of his duties and responsibilities under the Settlement Agreement, as well as the ramifications of his release of all claims against EWB.

**G.    Misappropriation of EWB's Trade Secrets and Theft of EWB's Confidential and Proprietary Information**

42.    After Shanker left EWB, EWB learned that he had kept a number of printed documents that belonged to EWB in a box in his house. These documents included highly sensitive documents created by a consultant, in collaboration with EWB's employees providing banking and compliance expertise, for EWB's business purposes and a hard copy of EWB's Financial Crime Controls for Digital Bank.  EWB's Financial Crime Controls for Digital Bank sets forth EWB's proprietary Know Your Customer ("KYC"), Anti-Money Laundering ("AML"), Office of Foreign Assets Control ("OFAC"), and fraud strategies and solutions for resolving financial crime-related risks associated with onboarding non-resident alien customers.  Shanker kept these documents in breach of his obligations under the various confidentiality agreements that he signed with EWB, as well as the express terms of the parties' Settlement Agreement.

43.    In or around September 2020, EWB conducted a search of Shanker's EWB email account to determine whether Shanker had forwarded any of EWB's proprietary materials outside of EWB.  When the email search was completed, EWB discovered that Shanker had forwarded over forty EWB documents related to the Velo platform to his personal email accounts on or around March 13, 2019 (Shanker's last day working at EWB).  The Velo-related documents that Shanker forwarded to his personal email accounts included highly proprietary documents that provided Defendants with a treasure trove of proprietary information that they unlawfully used to create a directly competing product, Aeldra.

44.    The information Shanker stole includes, but is not limited to:

a.    Confidential PowerPoint presentation including EWB's:

    i.    Target customer profiles

    ii.    Pricing policies

    iii.    Proposed internal guidelines for issuing credit to non-U.S. citizens

b.    Confidential digital banking project and consulting forecast summary including:

            i.   EWB's full organizational project chart with names of employees, and hire date

           ii.   Future hiring plans

          iii.   Current and future project budgets

          iv.   Consultant names, costs, and projected costs

c. Workforce planning document including:

            i.   Vendor summaries

           ii.   Compensation summaries

          iii.   Analytics

          iv.   Expense details

d. Marketing campaign document including:

            i.   Marketing use cases for various campaigns

           ii.   Marketing frameworks

          iii.   Vendor pricing

          iv.   Future plans

e. A document from EWB's Consultant including:

            i.   A structural breakdown of EWB's website.

           ii.   Workflow for onboarding via the Velo app.

f. A data mapping document detailing the input and output of EWB systems and program function calls.

g. A document detailing the prompt and response flow for EWB's onboarding process.

h. A document detailing the rollout schedules for new onboarding feature sets.

i. A document identifying onboarding risk categories for various EWB products and services along with the financial amounts for transactions that trigger alerts.

j. A document detailing EWB's know your customer conditions for future state workflow processes to onboarding customers for a digital channel.

k. A document detailing EWB's MVP decision tree processes, including system monitors and authentication criteria to protect against the use of malware and bots.

l.   A presentation document concerning EWB's digital banking that includes:

    i.   The communication technology stack for digital banking that identifies each vendor/digital intermediary

    ii.  Communication workflows

    iii. Next steps

m.  A presentation document concerning EWB's digital bank fraud approach including:

    i.   A detailed identification of some of the most concerning fraud vectors for EWB

    ii.  A list of options for how to address those concerning fraudulent transactions

    iii. A business roadmap for the launch of the Velo platform

    iv.  Target market prioritization

n.  A document that discusses whether to introduce credit cards with the Velo platform, including:

    i.   Compliance materials

    ii.  Credit score criteria

    iii. Goals

    iv.  Execution roadmap

o.  A document detailing an update to the Velo platform that discusses:

    i.   EWB's priorities

    ii.  EWB's approach for reaching those priorities

p.  An analytics presentation that discusses:

    i.   Marketing analytics while identifying technology options

    ii.  Return on investment and number of impressions from paid marketing activities

q.  A presentation detailing EWB's financial crime controls for its digital banking, including:

    i.   Anti-money laundering

    ii.  Know your customer

SECOND AMENDED COMPLAINT

iii.  Office of Foreign Account Control

iv.  Fraud

r.  A document containing a proposal for Velo including:

i.  A complete listing of the total deposit amounts for deposits held by EWB by age and by product type.

45.     Shanker had not asked for authorization from management prior to sending himself these documents and did not have any authorization or permission to do so.

46.     The trade secrets that Shanker is alleged to have stolen are identified with particularity in EWB's Amended Identification of Trade Secrets.  A copy of EWB's Amended Identification of Trade Secrets is attached as **Exhibit D**.

47.     In addition to the misappropriation of EWB's trade secrets, Shanker improperly possessed and retained EWB's confidential and/or proprietary information after his employment at EWB ended, including but not limited to:

a.  Velo Terms and Conditions

b.  Velo Online Banking Agreement

c.  Velo Mobile Remote Deposit Services Agreement

d.  Vendor Agreements (e.g., Application Service Provider Agreement)

e.  EWB Fee Schedules

f.  ECARD Payment Solution Business Plan

g.  EWB Unionpay Pre-Paid Card Test Instructions.

48.     On information and belief, there is likely additional confidential, proprietary, and trade secret information that Shanker removed from EWB by other methods that EWB has not yet discovered.

49.     On information and belief, Shanker shared EWB's confidential, proprietary, and trade secret information with the other Defendants and other third-parties.  On information and belief, Defendants currently possess this information, are using this information, and intend to continue to use this confidential, proprietary, and trade secret information to unfairly compete with EWB's Velo platform.

50.     On information and belief, after receiving EWB's confidential, proprietary, and trade secret information from Shanker, the other Defendants retained and used it, knowingly interfering with Shanker's legal and contractual obligations to EWB.

51.     As set forth further below, Defendants then used EWB's confidential, proprietary, and trade secret information to develop a competitive product (the Aeldra digital banking application) and to unfairly compete with EWB for its current and prospective customers and tortiously interfered with EWB's prospective economic relations.  On information and belief, the other Defendants knowingly provided Shanker substantial assistance in retaining and using EWB's information to develop the Aeldra digital banking application.

**H.     Shanker's Fintech Start-ups**

52.     Shortly after Shanker's termination at EWB, Shanker began to work on a fintech start-up called Alpha Oak Financial, Inc. ("Alpha Oak") with a former EWB employee, Rohit Mehtani ("Mehtani").   On information and belief, Alpha Oak was incorporated as a Delaware corporation on or about August 23, 2019.  On August 24, 2019, Shanker emailed EWB's proprietary materials to Mehtani, including but not limited to:  (a) excerpts of an EWB slide deck entitled "EWB-Digital Bank Fraud Management Approach Project Update" and (b) screenshots of an EWB document entitled "Copy of IBM Pinpoint Decision Flow and Azure Logic."

53.     On information and belief, in or around August 2019, Shanker met with several potential investors regarding funding for Alpha Oak.  On information and belief, Shanker used EWB's confidential, proprietary, and trade secret information to prepare Alpha Oak investor materials, presentations, and internal documents.

54.     On information and belief, in or around October 2019, Shanker incorporated another fintech start-up called Aeldra.  In connection with Aeldra, Shanker disclosed EWB's confidential, proprietary, and trade secret information to Defendant Venkat Gopalakrishnan ("Gopalakrishnan"), Aeldra's Chief Operating Officer.  Gopalakrishnan had no prior experience with digital banking, nor with product development, product management, or technology prior to joining Aeldra.

55.     Shanker emailed EWB's proprietary materials to Gopalakrishnan, including but not limited to:

a. On August 14, 2019, Shanker emailed the following EWB documents to Gopalakrishnan: (i) Core framework for development of the Value Proposition; (ii) Update – Velo by East West Bank; and (iii) Target Customer Segment Prioritization;

b. On April 14, 2010, Shanker emailed an EWB document titled CX Competitive Review & User Journeys to Gopalakrishnan;

c. On May 7, 2020, Shanker emailed EWB's Velo Product Roadmap version 6 to Gopalakrishnan.

56. On information and belief, Defendant Gopalakrishnan used EWB's confidential, proprietary, and trade secret information in his capacity as Aeldra's Chief Operating Officer.

57. On information and belief, in or around February 2020, Defendants Aeldra and Shanker retained Defendant FS Vector to assist with the creation of Aeldra's compliance policies, methods, and procedures, including but not limited to, Aeldra's BSA/AML policies and procedures. On information and belief, Defendants Aeldra and Shanker disclosed EWB's confidential, proprietary, and trade secret information to Defendant FS Vector. On information and belief, Defendant FS Vector and the other Defendants used EWB's confidential, proprietary, and trade secret information to create Aeldra's compliance policies, methods, and procedures, including but not limited to, Aeldra's BSA/AML policies and procedures.

58. On information and belief, Defendants used EWB's confidential, proprietary, and trade secret information to design, develop, and build the Aeldra digital banking application.

I. **Defendants' Launch of the Aeldra Digital Banking Platform**

59. On or about December 10, 2020, Defendants Shanker and Aeldra issued a press release announcing the launch of Aeldra, a digital banking platform for nonresident non-U.S. citizens to open a U.S. bank account, without a social security number, through a mobile banking app.

60. Aeldra's website states:

U.S. residents or Indian citizens can download the Aeldra App and apply for an account digitally from anywhere in the world without the need to visit a branch or provide a physical document. In line with Aeldra's mission to make it easy for customers with a legitimate need for a U.S. bank account, Indian citizens do not

require a U.S. Social Security Number (SSN) to open an account if they have an Indian passport.  Account opening is subject to Aeldra's KYC and AML policies in line with U.S. government regulations.  Through proprietary algorithms, processes, and technologies Aeldra has digitized the KYC process …. The founders of Aeldra come from a conservative banking background and, unlike many other FinTech's, risk management and compliance are in the Company's DNA.[1]

61.    Aeldra's financial services have been and are currently offered through a partnership with Blue Ridge Bank.  On information and belief, Shanker disclosed EWB's confidential, proprietary, and trade secret information to Defendant Blue Ridge Bank and EWB's information was used by Defendants to design, develop, and build the Aeldra digital banking application.

62.    On or about May 20, 2021, Aeldra and Blue Ridge Bank issued a press release announcing Aeldra's plans to target customers in BRICS-Plus countries (Brazil, Russia, India, China, South Africa, and others) who have cross-border banking needs in the United States.  The press release included the following statements from Blue Ridge Bank's President and CEO, Brian K. Plum, and Defendant Shanker:

"Aeldra meets a significant need in today's banking environment," said Brian K. Plum, President and Chief Executive Officer of Blue Ridge Bank. "We are proud to partner with Sukeert and his team as we work together to provide unprecedented financial access to an underserved segment in the BRICS-Plus countries."
"The U.S. continues to attract the best and brightest from across the world," said Sukeert Shanker, Founder and CEO of Aeldra. "They deserve seamless access to U.S. financial services. However, the simple act of opening a bank account without an SSN is challenging, as is getting approved for a credit card or loan.  Our special partnership with Blue Ridge Bank aims to close the accessibility gap…"

63.    On information and belief, Defendants impermissibly used EWB's confidential, proprietary, and trade secret information to develop and launch Aeldra, a direct competitor to Velo. By doing so, Defendants unfairly and unlawfully gained a competitive advantage over EWB, because Defendants' conduct as alleged herein gave them a head start to launch a competitor company, without having to invest the substantial amount of time and financial resources in development and startup costs as EWB.

---

[1]    https://www.aeldra.com/faqs (last visited June 17, 2021).

64.    On information and belief, Defendants continue to use EWB's confidential, proprietary, and trade secret information to directly compete with Velo.  Among other things, Defendants are using EWB's Confidential Information in connection with the Aeldra platform, including but not limited to, the design, development, and/or creation of Aeldra's customer onboarding.

65.    On information and belief, Defendants have used EWB's confidential, proprietary, and trade secret information to raise funding for Aeldra from investors and have presented and/or pitched their competing products and/or services to banks/financial institutions that compete with EWB.

**J.    The Court's July 22, 2021 Preliminary Injunction Order**

66.    On May 19, 2021, EWB filed a Motion for Preliminary Injunction in this action seeking to restrain and enjoin Defendants and all persons in active concert or participation with them from retaining and using EWB's Confidential Information.  EWB argued that Defendants used EWB's Confidential Information to design, develop, and create the Aeldra platform.

67.    In their opposition papers to EWB's Motion for Preliminary Injunction ("Opposition"), Defendants Shanker and Aeldra argued that they were not liable because, *inter alia*, Defendants allegedly "outsourced" the aspects of the Aeldra platform that were alleged to use EWB's Confidential Information.  Specifically, Defendants argued that the Aeldra platform "follows" Blue Ridge Bank's BSA/AML policies and with respect to FS Vector, Defendants argued: "EWB is wrong when it claims that Aeldra misappropriated its anti-fraud and anti-money laundering systems.  Those systems were created for Aeldra by a third-party compliance-consulting firm [FS Vector]."  Both Blue Ridge Bank and FS Vector submitted sworn witness declarations in support of Defendants' Opposition.

68.    On July 22, 2021, the Court issued an order granting EWB's Motion for Preliminary Injunction ("Preliminary Injunction Order").  The Preliminary Injunction Order provides:

a.    "Aeldra and Shanker, their officers, agents, servants, employees, attorneys, and all other persons who are in active concert or participation with them, and who receives actual notice of this order, whether or not in the United States, are RESTRAINED

AND ENJOINED from using, disclosing, distributing, or retaining any of EWB's confidential, proprietary, or trade secret information obtained by Defendant Shanker from or by virtue of his employment with EWB, including any Velo software/platform, pricing, customer, marketing, anti-fraud/anti-money laundering system/policy information ('EWB's Confidential Information');"

b.   "Defendant Shanker is RESTRAINED AND ENJOINED from violating his obligations under the confidentiality and settlement agreements with EWB, including without limitation, the terms of his agreements that prohibit the use or disclosure of EWB's Confidential Information;" and

c.   "Defendants Shanker and Aeldra shall deliver immediately to EWB all copies of documents, materials, and other media, whether in paper form or in an electronic medium, containing EWB's Confidential Information that Defendants have in their possession, custody, or control."

69.    Defendant Shanker did not return any Confidential Information to EWB after the Court issued the Preliminary Injunction Order.  On August 11, 2021, Defendant Aeldra produced the following documents to EWB in response to the Court's Preliminary Injunction Order:

a.   The August 14, 2019 email from Defendant Shanker to Defendant Gopalakrishnan forwarding EWB's target customer strategy documents:  (i) Core framework for development of the Value Proposition; (ii) Update – Velo by East West Bank; and (iii) Target Customer Segment Prioritization;

b.   The May 7, 2020 email from Defendant Shanker to Defendant Gopalakrishnan forwarding EWB's Velo Product Roadmap version 6; and

c.   The "2020 Aeldra Product Roadmap" that includes EWB's Velo Product Roadmap version 6 copied verbatim into the document, as well as EWB's Velo product features list, EWB's customer experience research, EWB's event triggers and alerts developed for the Velo platform, and other EWB Confidential Information.

70.    These documents evidence that Defendants used EWB's Confidential Information to develop, design, and create the Aeldra platform.  On information and belief, Defendants are

violating the Preliminary Injunction Order by continuing to retain and use EWB's Confidential Information in connection with the Aeldra platform, including but not limited to, Aeldra's customer onboarding.

**FIRST CAUSE OF ACTION**

**Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets Act**

**(18 U.S.C. § 1836, *et seq.*)**

**(Against all Defendants)**

71.    EWB repeats and realleges the allegations of paragraphs 1 through 70 of the Complaint as if fully set forth here.

72.    As set forth above, EWB owns and has in its possession certain trade secret information, including but not limited to, confidential and proprietary decision trees, algorithms, source code, and processes, independently-derived procedures, methods, techniques, and policies to detect fraud and money laundering, and non-public, internal financial strategic planning documents.

73.    EWB has made reasonable efforts to maintain the confidentiality of its trade secrets. EWB's trade secrets derive independent economic value from not being generally known to the public or to other persons who can obtain economic value from their disclosure or use.

74.    On information and belief, Defendant Shanker used and misappropriated EWB's trade secrets by, among other things, exceeding his authorization to access, use, and disclose EWB trade secret information and impermissibly sending EWB's confidential, proprietary, and trade secret information from his company email account to his private email account shortly before leaving EWB.  Shanker knew or had reason to know that he acquired and/or retained EWB's trade secret information under circumstances giving rise to a duty to maintain the information's secrecy and limit its use.  This duty was also expressly embodied in the multiple confidentiality agreements that Shanker signed while employed at EWB.  Shanker also had a duty to return any documents or other material that belonged to EWB pursuant to the parties' Settlement Agreement.

75.    On information and belief, Defendants impermissibly used and misappropriated EWB's trade secrets to develop and launch Aeldra, a direct competitor to Velo, and to unfairly and unlawfully gain a competitive advantage over EWB's Velo platform.

76.     On information and belief, Defendants impermissibly used and misappropriated EWB's trade secrets to raise funding for Aeldra from investors and have presented and/or pitched their competing products and/or services to banks/financial institutions that compete with EWB.

77.     On information and belief, Defendants' misappropriation of EWB's trade secrets was intentional, knowing, willful, malicious, fraudulent, and oppressive.

78.     As a direct and proximate result of Defendants' misconduct, Defendants have been unjustly enriched, and EWB has suffered and will continue to suffer damages, including goodwill, reputation, competitive disadvantages with other banking competitors, and an increased risk of third parties attempting to commit fraud and money laundering.

79.     Defendants' conduct and continued use of EWB's misappropriated trade secrets has caused, and unless enjoined by the Court, will continue to cause, great and irreparable harm and injury to EWB.  Plaintiff has no other adequate remedy at law for such acts.  Plaintiff, therefore, requests the Court issue a preliminary and permanent injunction, restraining and enjoining Defendants and anyone acting in concert with them, from: (i) obtaining, using or disclosing EWB's trade secrets for any purpose whatsoever and (ii) directing Defendants to return and immediately destroy all copies of information obtained from EWB in their possession, custody or control.

80.     EWB is entitled to recover from Defendants the damages it has sustained as a result of Defendants' wrongful acts as alleged in this Complaint in an amount to be determined at trial. EWB is further entitled to recover from Defendants any gains, profits, advantages, and unjust enrichment they have obtained as a result of their wrongful acts, in an amount to be determined at trial.  EWB is further entitled to an award of exemplary damages and attorney's fees.

## SECOND CAUSE OF ACTION

### Breach of Contract

### (Against Defendant Shanker)

81.     EWB repeats and realleges the allegations of paragraphs 1 through 80 of the Complaint as if fully set forth here.

82.     Before EWB provided Shanker access to the confidential, proprietary, and trade secret information required for Shanker to execute his job duties and responsibilities, EWB required

Shanker to execute a confidentiality agreement and agree to maintain the secrecy of that information and only use it for the benefit of EWB. He further agreed to refrain from removing or making copies of any company records, reports or documents without prior management approval. This agreement is valid and enforceable contract between Plaintiff and Shanker.

83.    When Shanker left his position of employment at EWB, Shanker executed a second confidentiality agreement and again agreed to maintain the secrecy of that information and only use it for the benefit of EWB. Shanker further agreed that he had not removed or made copies of any company records, reports or documents without prior management approval. This agreement is valid and enforceable contract between Plaintiff and Shanker.

84.    In addition to the aforementioned confidentiality agreements, Shanker entered into a Settlement Agreement with EWB wherein he agreed to the following: "Employee agrees that Employee has turned over or will turn over to the Bank, all property belonging to the Bank, including but not limited to documents concerning the Bank's customer and personnel matters, any and all of the Bank's files, tapes, documents, keys, credit cards, telephone cards, books, software, passwords, equipment, manuals, tools and written materials."

85.    EWB performed its obligation under the confidentiality agreements by granting Plaintiff access to the confidential, proprietary, and trade secret information for use by Plaintiff solely in connection with his duties and responsibilities in connection with his employment with EWB and solely for the benefit of EWB. EWB performed its obligation under the Settlement Agreement by paying Shanker ████ .

86.    Shanker breached his obligations under the contracts by, among other things, accessing, using, and transmitting the confidential, proprietary, and trade secret information compiled for purposes not authorized by Plaintiff. He further breached his obligations under the contract by sending EWB's confidential and trade secret information to his personal email account without prior management approval and failing to return the documents after his execution of the Settlement Agreement.

87.    As a direct and proximate result of Shanker's breach of the contracts, Plaintiff has suffered harm.

### THIRD CAUSE OF ACTION

**Breach of The Implied Covenant of Good Faith and Fair Dealing**

**(Against Defendant Shanker)**

88.    EWB repeats and realleges the allegations of paragraphs 1 through 87 of the Complaint as if fully set forth here.

89.    EWB and Shanker entered into the confidentiality and Settlement Agreements.

90.    In the confidentiality agreements, Shanker agreed to maintain the secrecy of that information and only use it for the benefit of EWB. Shanker further agreed that he had not removed or made copies of any company records, reports or documents without prior management approval. These agreements are valid and enforceable contracts between Plaintiff and Shanker.

91.    In the Settlement Agreement Shanker agreed that, as consideration for EWB paying him ████, Shanker would release his claims against EWB and "agree[d] that Employee has turned over or will turn over to the Bank, all property belonging to the Bank, including but not limited to documents concerning the Bank's customer and personnel matters, any and all of the Bank's files, tapes, documents, keys, credit cards, telephone cards, books, software, passwords, equipment, manuals, tools and written materials."

92.    EWB performed its obligation under the confidentiality agreements by granting Plaintiff access to the confidential, proprietary, and trade secret information for use for the benefit of EWB. EWB performed its obligation under the Settlement Agreement by paying Shanker ████.

93.    Shanker breached the implied covenant of good faith and fair dealing by secretly taking EWB's confidential, proprietary, and trade secret information, falsely representing that he did not, possessing and using that information, and failing to return such information.

94.    By his breach, Shanker has unfairly interfered with EWB's right to receive the benefit of the contracts.

95.    As a direct and proximate result of Shanker's breach of the contracts, Plaintiff has suffered harm.

**FOURTH CAUSE OF ACTION**

**Breach of Fiduciary Duty**

**(Against Defendant Shanker)**

96.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 95 of the Complaint as if fully set forth here.

97.    As a Senior Vice President of Project Management, Shanker owed EWB a fiduciary duty to maintain the trade secrets and other confidential and proprietary information of EWB in strict confidence, and to use those trade secrets and confidential information only for the benefit of EWB.

98.    Instead, Shanker breached his fiduciary duty to EWB by sending EWB's trade secrets and confidential information to his personal email account for his own personal use in direct competition with EWB.

99.    As a direct and proximate result of Shanker's breach of his fiduciary duties, Plaintiff has suffered damage and continues to suffer damage in an amount to be proven at trial.

100.    Shanker's foregoing conduct was done with an intentional and conscious disregard of Plaintiff's rights and with oppression, fraud, and malice as defined pursuant to California Civil Code § 3294.

**FIFTH CAUSE OF ACTION**

**Violation of California Bus. & Prof. Code § 17200 *et seq.***

**(Against all Defendants)**

101.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 100 of the Complaint as if fully set forth here.

102.    Defendants' wrongful conduct, as described above and incorporated by reference herein, constitutes unfair competition in violation of Cal. Bus. Prof. Code § 17200 *et seq*.

103.    Defendants' unfair competition caused and continues to cause substantial and irreparable harm to EWB.

104.   On information and belief, Defendants have actual notice of the Court's Preliminary Injunction Order. Each of the Defendants has been served, or will be served, with a copy of the Order.

105.   On information and belief, after the Court entered the Preliminary Injunction Order, Defendants have continued, and will continue, to use, disclose, distribute, and/or retain EWB's Confidential Information. On information and belief, Defendants, and each of them, are also helping the other Defendants to use, disclose, distribute and/or retain EWB's Confidential Information in violation of the Preliminary Injunction Order, and thus to commit a contempt of Court.

106.   Plaintiff has been harmed as a result of Defendants' unlawful business acts and practices. Plaintiff is entitled to (a) recover restitution, including without limitation, all benefits that Defendants have received as a result of their unlawful business acts and practices and (b) an injunction restraining Defendants from engaging in further acts of unfair competition.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully seeks an Order of this Court:

1.   For actual damages in an amount to be proven at trial;

2.   For restitution;

3.   For reimbursement of the ███ that EWB paid as consideration for the Settlement Agreement;

4.   Finding that Defendants have willfully and maliciously misappropriated EWB's trade secrets and award damages pursuant to the DTSA, including but not limited to, injunctive relief, monetary damages in an amount to be proven at trial, exemplary damages, and/or other appropriate relief;

5.   For an award of punitive damages in amount to be proven at trial;

6.   For a permanent injunction, as follows: (a) compelling Defendants to immediately return to EWB all of EWB's confidential, proprietary, or trade secret information in Defendants' possession, custody, or control; (b) enjoining Defendants, their agents, employees, and all other persons in privity or acting in concert with Defendants from directly or indirectly using or disclosing, or attempting to use or disclose, any of EWB's confidential, proprietary, or trade secret

information; (c) enjoining Defendants from retaining any computers, laptops, tablets, smart phones, cellular or other telephones, electronic media or storage devices, personal data assistants, flash drives, files, or any other form of electronic or recording or storage device, that contains EWB's confidential, proprietary, or trade secret information; (d) enjoining Defendants from using EWB's confidential, proprietary, or trade secret information to solicit, directly or indirectly, business; (e) enjoining Defendants from using EWB's confidential, proprietary, or trade secret information to solicit, directly or indirectly, any investors of Aeldra; (f) ordering Defendants to account for all gains, profits, and advantages they have derived from their misappropriation of EWB's confidential, proprietary, or trade secret information; (g) other injunctive relief, including but not limited to, appointment of a special master to oversee Aeldra to ensure that Defendants do not use or disclose EWB's confidential, proprietary, or trade secret information;

7.    The imposition of a constructive trust;

8.    For pre-judgment and post-judgment interest at the maximum legal rate, as applicable, as an element of damages that Plaintiff has suffered as a result of Defendants' wrongful acts;

9.    For reasonable attorneys' fees and costs incurred herein as allowed by law; and

10.   For such other relief as the Court deems just and proper.

DATED:  August 16, 2021

                                Ekwan E. Rhow
                                Grace W. Kang
                                Jonathan M. Jackson
                                Aharon B. Kaslow
                                Bird, Marella, Boxer, Wolpert, Nessim,
                                Drooks, Lincenberg & Rhow, P.C.


                                By:    _____/s/ Grace W. Kang_____
                                            Grace W. Kang
                                Attorneys for Plaintiff East West Bank

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues so triable.


DATED:  August 16, 2021                    Ekwan E. Rhow
                                            Grace W. Kang
                                            Jonathan M. Jackson
                                            Aharon B. Kaslow
                                            Bird, Marella, Boxer, Wolpert, Nessim,
                                            Drooks, Lincenberg & Rhow, P.C.


                                    By:      */s/ Grace W. Kang*
                                    _____
                                            Grace W. Kang
                                    Attorneys for Plaintiff East West Bank

# Exhibit A

# Confidential Information Notice

The protection of confidential business information and trade secrets is vital to the interests and the success of East West Bank. Such confidential information includes but is not limited to the following examples:

- Client lists and file lists
- Any information related to clients and suppliers
- Financial information
- Marketing strategies
- Employee compensation and other private information of employee
- Pending projects and proposals
- Any information marked confidential, proprietary, trade secret, or otherwise requiring confidentiality

You are required to keep confidential the confidential information and use it only as required by your job for the benefit of the Company during or after your employment with the Company. No one is permitted to remove or make copies of any Company records, reports or documents without prior management approval.

It is not the Company's desire to receive from any employee proprietary information belonging to others without prior authorization. You are prohibited from disclosing to the Company or using any such information without authorization from the owner of the information while employed by the Company.

Any violation of this policy can seriously injure the Company's reputation and effectiveness. Use of unauthorized confidential may also lead to criminal sanctions. Therefore, please do not discuss the Company's business with anyone who does not work for us, and never discuss business transactions with anyone who does not have a direct association with the transaction. Even casual remarks can be misinterpreted and repeated, so develop the personal discipline necessary to maintain confidentiality.

Any employee who discloses trade secrets or confidential business information without authorization from senior management of the Company will be subject to disciplinary action (including possible discharge) and legal action, even if he or she does not actually benefit from the disclosed information.

Exceptions: Individuals may disclose trade secrets without being civilly or criminally liable under Federal or State trade secret law where the disclosure is made: 1) in confidence to a Federal, State, or local government official, or to an attorney, and solely for the purpose of reporting or investigating a suspected

violation of law; or 2) in a complaint or other filing in a lawsuit or other proceeding, and filed under seal.

**Signature**

☑ SUKEERT Shanker 12/22/2017 10:47 AM

(checking the checkbox above is equivalent to a handwritten signature)

Exhibit B

## CONFIDENTIAL INFORMATION

The protection of confidential business information and trade secrets is vital to the interests and the success of East West Bank. Such confidential information includes but is not limited to the following examples:

- Intellectual property
- Client lists and file lists
- Any information related to clients and suppliers
- Financial information
- Marketing strategies
- Employee compensation and other private information of employees
- Pending projects and proposals
- Any information marked confidential, proprietary, trade secret, or otherwise requiring confidentiality

You are required to keep confidential the confidential information and use it only as required by your job for the benefit of the Company during or after your employment with the Company. No one is permitted to remove or make copies of any Company records, reports or documents without prior management approval.

It is not the Company's desire to receive from any employee proprietary information belonging to others without prior authorization. You are prohibited from disclosing to the Company or using any such information without authorization from the owner of the information while employed by the Company.

Any violation of this policy can seriously injure the Company's reputation and effectiveness. Use of unauthorized confidential information may also lead to criminal sanctions. Therefore, please do not discuss the Company's business with anyone who does not work for us, and never discuss business transactions with anyone who does not have a direct association with the transaction. Even casual remarks can be misinterpreted and repeated, so develop the personal discipline necessary to maintain confidentiality.

Any employee who discloses trade secrets or confidential business information without authorization from senior management of the Company will be subject to disciplinary action (including possible discharge) and legal action, even if he or she does not actually benefit from the disclosed information.

All Intellectual property is considered by East West Bank to be confidential information. Any intellectual property created by employees involving or related to East West Bank's business operations, including but not limited to patents, copyrights, inventions, trademarks, designs, domain names, trade names, articles, ideas and concepts are the sole property of East West Bank. Ownership of the intellectual property also applies to any application for rights of the property as well.

Employees and former employees are required to take reasonable security measures to prevent confidential information from disclosure, including accidental disclosure as well as industrial espionage attacks.

_____          05/2/19
Signature                                        Date

Exhibit B

- 3 -

Exhibit C



# EASTWESTBANK

## SETTLEMENT AGREEMENT AND RELEASE OF CLAIMS

THIS AGREEMENT (hereinafter referred to as "Agreement") is made and entered into by and between Sukeert Shanker (hereinafter referred to as "Employee"), and East West Bank (hereinafter referred to as "the Bank").

A.    WHEREAS, Employee was hired by the Bank on December 22, 2017 and held the position of SVP COO Digital Banking;

B.    WHEREAS, Employee was employed by the Bank whereby employment was "at-will;"

C.    WHEREAS, Employee agrees that Employee was separated from employment with the Bank effective May 1, 2019;

E.    WHEREAS, Employee and the Bank desire to settle fully and settle finally any and all matters or differences between them concerning the employment relationship including, but in no way limited to, any differences that might arise out of Employee's employment and/or the termination thereof; and

NOW THEREFORE, in consideration of the promises herein contained, it is agreed as follows:

1.    The above-mentioned recitals are hereby incorporated into, and made a part of, this Agreement.

2.    This Agreement shall not in any way be construed as an admission by the Bank of any wrongful acts or acts of discrimination whatsoever against Employee or any other person, and the Bank specifically disclaims any liability to, or discrimination against Employee or any other person, on the part of itself, its employees, or its agents.

3.    As consideration for the releases set forth in this Agreement, the Bank shall pay Employee the gross sum of ███████████████████████████████, less all applicable deductions and withholdings for State and Federal taxes (hereinafter referred to as the "Severance Amount"). Payment of the Severance Amount shall be made on or about the eighth (8th) day after both the Bank and Employee have executed this Agreement, and shall be paid as follows:

(A)    ████████ issued to Law Offices of McGuinn, Hillsman & Palefsky, without deduction for which a 1099 will be issued;

1

Exhibit C

(B)        less all applicable payroll deductions and withholdings including for State and Federal taxes, issued to Sukeert Shanker, to be included in his year-end W-2.

4.     Employee agrees that Employee has turned over or will turn over to the Bank, all property belonging to the Bank, including but not limited to documents concerning the Bank's customer and personnel matters, any and all of the Bank's files, tapes, documents, keys, credit cards, telephone cards, books, software, passwords, equipment, manuals, tools and written materials.

5.     Employee represents and agrees that Employee will keep the terms and amount of this Agreement confidential. Nothing herein shall prevent Employee from disclosing any part of this Agreement or the information contained herein to Employee's legal counsel, tax advisor, or spouse, so long as such disclosure is accompanied by a warning that the recipient must keep the information confidential. Moreover, the Bank represents and agrees that the Bank will keep the terms and amount of this Agreement confidential, and will not disclose this information to anyone other than the Bank's tax or legal advisors, its Human Resources department, or senior employees of the Bank who have a business need to know, so long as such disclosure is accompanied by a warning that the recipient must keep the information confidential.

6.     This Agreement may not be used as evidence in court proceedings, except in an action alleging a breach of this Agreement. The parties expressly agree to waive the provisions of California Evidence Code §1152 solely to the extent necessary to render this Agreement admissible in a proceeding to enforce the provisions hereof. It shall not be a breach of this Agreement for either party to comply with a valid court order or subpoena requiring the disclosure of any information about this Agreement, so long as, in the case of Employee, Employee notifies the Bank of such court order, and allows it the opportunity to move to quash such order.

7.     As a material inducement to the Bank to enter into this Agreement, Employee hereby irrevocably and unconditionally releases, acquits, and forever discharges the Bank and each of the Bank's owners, shareholders, predecessors, successors, assigns, agents, directors, officers, employees, representatives, attorneys, divisions, subsidiaries, affiliates (and agents, directors, officers, employees, representatives and attorneys of such divisions, subsidiaries and affiliates), and all persons acting by, through, under or in concert with any of them (collectively "Employee's Releasees"), or any of them, from any and all complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, costs, losses, debts and expenses (including attorneys' fees and costs actually incurred), of any nature whatsoever, including but not limited to claims arising from the California Constitution; Title VII of the Civil Rights Act of 1964 (42 U.S.C. §2000e); the California Fair Employment and Housing Act (Cal. Govt. Code §12900 et seq.); the Americans with Disabilities Act; the Age Discrimination in Employment Act (29 U.S.C. §§621-633a); the Older Workers' Benefit Protection Act; Section 132a of the California Labor Code; and claims of intentional infliction of emotional distress; breach of implied contract; or any other statute or common law principle of similar effect, known or unknown ("Employee's Claim" or "Employee's Claims"), which Employee now has, owns, or holds, or claims to have, own or hold, or which Employee at any time heretofore had, owned, or held, or claimed to have, own, or hold or which Employee at any time hereinafter may have, own, or hold, or claim to have, own, or hold, against each or any of the Employee's Releasees, arising from acts, events, or circumstances occurring on or before the effective date of this Agreement.

If any claim is not subject to release, to the extent permitted by law, Employee waives any right

2

Exhibit C

or ability to be a class or collective action representative or to otherwise participate in any putative or certified class, collective or multi-party action or proceeding based on such a claim in which the Bank or any other of Employee's Releasees identified in this Agreement is a party.

8. Nothing in this Settlement Agreement prohibits or prevents Employee from filing a charge with or participating, testifying, or assisting in any investigation, hearing, whistleblower action, or other proceeding before any federal, state, or local government agency (*e.g.*, EEOC, DFEH, NLRB, SEC, *etc.*), nor does anything in this Settlement Agreement preclude, prohibit, or otherwise limit, in any way, Employee's rights and abilities to contact, communicate with, report matters to, or otherwise participate in any whistleblower program administered by any such agencies. Employee also is not restricted from testifying in an administrative, legislative, or judicial proceeding concerning alleged criminal conduct or alleged sexual harassment on the part of the other party to the Settlement Agreement, or on the part of the agents or employees of the other party, when the Employee has been required or requested to attend the proceeding pursuant to a court order, subpoena, or written request from an administrative agency or the legislature. However, to the maximum extent permitted by law, Employee agrees that if such an administrative claim is made, Employee shall not be entitled to recover any individual monetary relief or other individual remedies. In addition, nothing in this Settlement Agreement, including, but not limited to, the release of claims, nor the confidentiality provisions set forth in Section 9 above, prohibits Employee from: (1) reporting possible violations of federal law or regulations, including any possible securities laws violations, to any governmental agency or entity, including, but not limited to, the U.S. Department of Justice, the U.S. Securities and Exchange Commission, the U.S. Congress, or any agency Inspector General; (2) making any other disclosures that are protected under the whistleblower provisions of federal law or regulations; or (3) otherwise fully participating in any federal whistleblower programs, including, but not limited to, any such programs managed by the U.S. Securities and Exchange Commission or the Occupational Safety and Health Administration. Moreover, nothing in this Settlement Agreement prohibits or prevents Employee from receiving individual monetary awards or other individual relief by virtue of participating in such federal whistleblower programs.

9. This Agreement will be effective on the eighth day after it is signed by both Employee and the authorized representative of the Bank.

10. Employee expressly waives and relinquishes all rights and benefits afforded by Section 1542 of the Civil Code of the State of California and does so understand and acknowledge the significance and consequence of such specific waiver of Section 1542 of the Civil Code of the State of California which states as follows:

"A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party."

Employee also waives any right, claim or entitlement to future employment with the Employer and agrees not to seek employment with the Employer or any of its affiliated companies.

11. Employee further understands and acknowledges that this Agreement constitutes a voluntary waiver of any and all rights and claims Employee has against the Bank as of the date of the execution of this Agreement, and Employee has expressly waived rights or claims pursuant to this Agreement in exchange for consideration, the value of which exceeds payment

3

Exhibit C

or remuneration to which Employee was already entitled.

12.    This document constitutes the complete and entire Agreement between the parties pertaining to the subject matter hereof, and the final, complete and exclusive expression of the terms and conditions of their Agreement. Any and all prior agreements, representations, negotiations, and understandings between the parties, oral or written, express or implied, are hereby superseded and merged herein.

13.    This Agreement may be amended, changed, or modified only by a written document signed by all parties hereto. No waiver of this Agreement or of any of the promises, obligations, terms, or conditions hereof shall be valid unless it is written and signed by the party against whom the waiver is to be enforced.

14.    Employee represents that Employee has not heretofore assigned or transferred, or purported to assign or transfer, to any person or entity, any Employee's Claim or any portion thereof or interest therein. If any Employee's Claim should be made or instituted against Employee's Releasees, or any of them, because of any such purported assignment, Employee agrees to indemnify and hold harmless Employee's Releasees, and each of them, against any such Employee's Claim, including necessary expenses of investigation, attorneys' fees and costs.

15.    This Agreement is made and entered into in the State of California, and shall in all respects be interpreted, enforced and governed under the laws of said State. The language of all parts of this Agreement shall in all cases be construed as a whole, according to its fair meaning, and not strictly for or against any of the parties, by virtue of the identity, interest or affiliation of its preparer.

16.    Employee represents that Employee has not filed or authorized the filing of any complaints, charges, or lawsuits against Employee's Releasees, or any of them, with any Federal, State, or local court, governmental agency or administrative agency, and that if, unbeknownst to Employee, such a complaint, charge or lawsuit has been filed on Employee's behalf, Employee will use Employee's best efforts to cause it immediately to be withdrawn and dismissed with prejudice. Employee further agrees to execute any and all further documents and to perform any and all further acts reasonably necessary or useful in carrying out the provisions and purposes of this Agreement.

17.    Should any provision of this Agreement be declared or be determined by any court to be illegal or invalid, the validity of the remaining parts, terms or provisions shall not be affected thereby and said illegal or invalid part, term or provision shall be deemed not to be part of this Agreement.

18.    This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Signatures obtained via facsimile shall be deemed valid as if they were inked originals.

19.    Employee represents and acknowledges that in executing this Agreement that Employee does not rely and has not relied upon any representation or statement made by any of the Employee's Releasees or by any of the Employee's Releasees' agents, representatives or attorneys with regard to the subject matter, basis or effect of this Agreement or otherwise.

20.    Employee further states that Employee has carefully read this Agreement, that Employee has had opportunity to consult an attorney to have any questions concerning this

4

Exhibit C

Agreement explained to Employee, that Employee fully understands its final and binding effect, that the only promises made to Employee to sign this Agreement are those stated above and that Employee is signing this Agreement voluntarily.

21.    Employee specifically acknowledges that the Bank has advised Employee to retain counsel to have this Agreement reviewed and explained to Employee. Employee specifically acknowledges that Employee has been advised that under the Older Workers Benefit Protection Act, Employee has twenty-one (21) days to review this Agreement to consider it before signing it. Employee has been advised that Employee may decide to sign the Agreement sooner and may voluntarily waive the 21-day period provided by the said Act. Employee further acknowledges that Employee has had the opportunity to make counter-proposals to the Agreement, and has been advised that Employee has until seven (7) days after signing this Agreement to revoke this Agreement, and this Agreement will not be effective until the revocation period has expired.

22.    In the event Employee exercises the right to revocation, as discussed in paragraph 21 above, Employee must notify the Bank of such revocation in writing via email and certified mail, return receipt requested. Said notification will be considered timely if emailed and post-marked no later than the seventh day after Employee has signed this Agreement. This entire Agreement will be null and void if revoked by Employee during said revocation period. Any such revocation must be addressed to the attention of Jill Teitelbaum, at the following address: 135 N. Los Robles, 3ʳᵈ Floor, Pasadena, California, jill.teitelbaum@eastwestbank.com.

**EMPLOYEE**

DATED: 06/11/2019    By: _____

Sukeert Shanker

**EAST WEST BANK**

DATED: 6/13/2019    By: _____

Doug Krause

Its:    General Counsel

5

Exhibit C

Exhibit D

1  Ekwan E. Rhow - State Bar No. 174604
    erhow@birdmarella.com
2  Grace W. Kang - State Bar No. 271260
    gkang@birdmarella.com
3  Jonathan M. Jackson - State Bar No 257554
    jjackson@birdmarella.com
4  Aharon B. Kaslow - State Bar No. 322769
    akaslow@birdmarella.com
5  BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
  DROOKS, LINCENBERG & RHOW, P.C.
6  1875 Century Park East, 23rd Floor
  Los Angeles, California 90067-2561
7  Telephone: (310) 201-2100
  Facsimile: (310) 201-2110
8
  Attorneys for Plaintiff East West Bank
9

10  **UNITED STATES DISTRICT COURT**

11  **NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**

12

13  EAST WEST BANK, a California
  corporation,

14              Plaintiff,

15

16        vs.

17  SUKEERT SHANKER, an individual;
  AELDRA FINANCIAL INC., a Delaware
  corporation; and DOES 1-10,

18

19          Defendants.

CASE NO. 3:20-cv-07364-WHO

**EAST WEST BANK'S AMENDED
IDENTIFICATION OF TRADE SECRETS**

**CONTAINS
"CONFIDENTIAL"
INFORMATION**

Assigned to Hon. William H. Orrick

20

21

22

23

24

25

26

27

28

3718583.2

Plaintiff East West Bank ("EWB") hereby provides the following Amended Identification of Trade Secrets with reasonable particularity in this action. EWB expressly reserves the right to amend its Amended Identification of Trade Secrets at a later date, if discovery demonstrates good cause to provide such amendment. *See, e.g., Neothermia Corp. v. Rubicor Med., Inc.,* 345 F. Supp. 2d 1042, 1044 (N.D. Cal. 2004).

**EWB'S TRADE SECRETS**

EWB's trade secrets are highly valuable, closely guarded, and reflect substantial investments of time, money, resources, research and development, and know-how by EWB. EWB's trade secrets are confidential, proprietary, and derive independent economic value from not being generally known to the public or to other persons who can obtain economic value from their disclosure or use. EWB has made reasonable efforts to maintain the confidentiality of its trade secrets.

EWB asserts that Defendants Sukeert Shanker ("Shanker") and Aeldra Financial, Inc. ("Aeldra") (collectively, "Defendants") misappropriated trade secrets related to its Velo by East West Bank ("Velo") digital banking application. During his employment at EWB and in the course of his job duties, Shanker had access to EWB's trade secrets and confidential and proprietary information related to Velo. As detailed in the First Amended Complaint, Defendants unlawfully misappropriated and used EWB's trade secrets and confidential and proprietary information to develop and launch Aeldra, a direct competitor to Velo. By doing so, Defendants unlawfully gained an unfair competitive advantage by accessing and using EWB's confidential, proprietary, and trade secret information without having to invest the substantial amounts of time and financial resources in development and startup costs as EWB.

EWB identifies the following trade secrets that Defendants are alleged to have misappropriated in this action:

EWB designates the following Trade Secrets as "CONFIDENTIAL" under the Stipulated Protective Order, dated January 28, 2021. (Dkt. No. 28.)

1    Trade Secret 1:  Velo Product Roadmap

2    The Velo Product Roadmap was developed by EWB to provide a detailed master plan that

3    communicates the product vision, strategy, priorities, and product release milestones of the Velo

4    platform.  The Velo Product Roadmap discloses the detailed breakout of product features,

5    components, third party integrations, and third party vendors selected to assist in the development

6    and launch of the Velo platform.  The roadmap also includes the planned phased rollout and target

7    launch dates of product features over time and an analysis of engineering and integration effort

8    involved to launch each feature of the Velo platform.  A representative example of EWB's Velo

9    Product Roadmap trade secret is located in Shanker's document production at

10   SHANKER_0003923.

11    Trade Secret 2:  Digital Banking Architecture Diagrams

12    EWB's Digital Banking Architecture Diagrams illustrate a high level overview of the

13   design, processes, interactions, constraints, and boundaries of the data and system components

14   required to support EWB's online banking, identity management, access management, and cloud

15   deployment platforms.  EWB's Digital Banking Architecture Diagrams further disclose the third

16   party vendors, software, and hardware EWB uses for particular system functions, as well as a

17   compilation and analysis of EWB's third party vendors for the Velo platform.  Representative

18   examples of EWB's Digital Banking Architecture Diagrams trade secret are located in Shanker's

19   document production at SHANKER_0000687, SHANKER_0003972 and in EWB's document

20   production at EWB0001107, EWB0001329, EWB0001330.

21    Trade Secret 3:  Target State Architecture

22    EWB's Target State Architecture details the structure, mechanisms, and procedures

23   through which the Velo platform plans to achieve its intended goals for account onboarding and

24   Know Your Customer ("KYC") checks.  The Target State Architecture details product

25   requirements and designs to build each step of the onboarding process for the Velo platform,

26   including but not limited to interaction descriptions, screens the interactions takes place on within

27   the product, data inputs, data outputs, data output descriptions, dependencies, rules, and third party

28   services selected to develop the solution.  The Target State Architecture discloses the product and

1  technical requirements that would enable an engineering team to replicate the uniquely designed

2  foreign non-resident alien account onboarding and KYC check process for the Velo platform.

3  Representative examples of EWB's Target State Architecture trade secret are located in Shanker's

4  document production at SHANKER_00002416 and in EWB's document production at

5  EWB0000039.

6          Trade Secret 4:  Velo Algorithms and Processes

7          EWB's Velo Algorithms and Processes form the basis upon which Velo executes certain

8  functions in response to user activity.  EWB's Velo Algorithms and Processes provide the

9  proprietary steps by which users are enabled to open a foreign non-resident alien ("NRA") account

10  and disclose the codes and processes for EWB to monitor instances of fraud, anti-money

11  laundering, and Bank Secrecy Act requirements, as well as flag transactions and users for

12  suspicious activity.  EWB's Velo Algorithms and Processes were developed by EWB to provide

13  unique methods for EWB to onboard NRA users of its digital banking application, ensure the

14  security of online transactions, and provide intelligent, automated responses to user inquiries.

15          Trade Secret 5:  Velo Value Proposition and Roadmaps

16          EWB's Velo Value Proposition and Roadmaps contain a compilation of alerts coded by

17  category and ranked by importance.  The Velo Value Proposition and Roadmaps discloses the

18  subsequent procedures EWB should perform in the event an alert event is triggered, such as

19  whether to send the user a text message, email, or phone call.  EWB's Velo Value Proposition and

20  Roadmaps further compiles the steps a customer takes in deciding whether to open a bank account

21  and includes Velo's confidential and proprietary responses to those steps.  Additionally, EWB's

22  Velo Value Proposition and Roadmaps discloses how EWB has organized and categorized each

23  feature of Velo (in a numerical system).  EWB's numerical category system contains details of

24  each category, as well as identifying the vendors that will provide additional information or

25  support on specific aspects of certain features and categories, including vendor and product

26  pricing.  A representative example of EWB's Velo Value Proposition and Roadmaps trade secret

27  is located in Shanker's document production at SHANKER_002658.

28

1    <u>Trade Secret 6: Velo Product Features and Designs</u>

2        EWB's Velo Product Features and Designs describe the appearance of the Velo dashboard,

3    as well as provide an analysis of mobile banking application users and various Velo features, such

4    as user alerts.  For example, the Velo Product Features and Designs disclose the expected reasons

5    and frequency customers may want to use the Velo platform, an analysis of the value proposition

6    for engaging with customers at various stages of product awareness and adoption, and

7    identification and importance level ranking of categorized alerts to help customers manage actions

8    taken within the product.  The Velo Product Features and Designs also details EWB's internal

9    strategies to increase utilization of mobile banking and describes methods by which EWB can put

10   in place alerts to protect customer data and minimize risks of fraud, in the event an alert event is

11   triggered, such as whether to send the user a push notification, text message, email, or phone call.

12   Additionally, the Velo Product Features and Designs detail the steps a customer may take in

13   opening a bank account and describe EWB's confidential and proprietary responses to those steps

14   within the Velo product.  The Velo Product Features and Designs also include information on how

15   EWB plans to allocate resources, describes the team leads responsible for creating requirements

16   for various features of Velo, and discloses the number and names of cross-functional teammates

17   responsible for developing those features.  Representative examples of EWB's Velo Product

18   Features and Designs trade secret are located in Shanker's document production at

19   SHANKER_0002429 and EWB's document production at EWB0000042 at 46-49; EWB0001150

20   at 1151-1164; EWB0001145 at 1145-1147; SHANKER_0000742 at 746, 750-52.

21   <u>Trade Secret 7: Fraud Prevention Systems</u>

22       EWB's Fraud Prevention Systems were designed to detect and mitigate fraud for EWB's

23   digital banking platform.  EWB's Fraud Prevention Systems disclose EWB's internally developed

24   questions for Customer Due Diligence, customer segments and risk profiles, rules for fraud

25   detection, and phased rollout business roadmap.  EWB's Fraud Prevention Systems are the result

26   of significant analysis, research and development, consultation with experts, as well as vendor and

27   in-house solutions to protect its customers from fraud.  Representative examples of EWB's Fraud

28   Prevention Systems trade secret is located in EWB's document production at EWB0001110,

1   EWB0001167.

2          Trade Secret 8:  Decision Trees

3          EWB's Decision Trees were developed by EWB to compile EWB's decision-making

4   processes for its digital banking platform.  The Decision Trees disclose, for example, the methods,

5   processes, and procedures behind EWB's Know Your Customer ("KYC") and onboarding

6   processes.  EWB's Decision Trees further disclose the formulas and processes through which

7   EWB and its third party vendors screen customer information against global watchlists, analyze

8   customer data such as IP addresses, identification cards, and mobile devices to verify customer

9   backgrounds and their geolocation, as well as detect malware and "bot" applications.  EWB's

10  Decision Trees also disclose aspects of EWB's processes used to determine whether to accept,

11  further review or reject an application for an EWB bank account based on satisfying banking

12  regulations and KYC standards.  EWB's Decision Trees further disclose the methods EWB uses to

13  monitor and detect fraudulent and/or money laundering activity, as well as the steps EWB takes to

14  determine the credit-worthiness of an EWB customer.  A representative example of EWB's

15  Decision Trees trade secret is located in EWB's document production at EWB0000036.

16         Trade Secret 9: KYC Review Strategies

17         EWB's KYC Review Strategies disclose the methods EWB uses to determine whether a

18  device accessing EWB's banking platform is compromised.  EWB's KYC Review Strategies also

19  disclose the process by which EWB can perform device and user verification, as well as document

20  verification.  The KYC Review Strategies contain EWB's methods to perform such verification

21  checks based on whether the user is a US citizen or foreign national and evaluates which

22  verification checks should be run based on the nationality of the user.  Representative examples of

23  EWB's KYC Review Strategies trade secrets are located in EWB's document production at

24  EWB0000034, EWB0001464.

25         Trade Secret 10: Compliance Policies to Combat Fraud and Money Laundering

26         EWB's Compliance Policies to Combat Fraud and Money Laundering demonstrate EWB's

27  fraud goals for digital banking, the key risks present in digital banking (such as synthetic ID

28  hacking and rapid on-boarding of bad actors), the methods EWB employs to effectively monitor

1  and detect fraud in digital banking, and which vendors EWB believes are best suited to provide

2  assistance on various fraud issues.  EWB's Compliance Policies to Combat Fraud and Money

3  Laundering disclose the processes that EWB has confirmed are sufficiently protective so as to

4  ensure compliance with relevant laws and regulations, as well as what changes EWB plans to

5  make in order to adapt those policies to the digital banking context—including, for example,

6  changes in customer risk scoring and vendor selections—and, in some instances, having to create

7  entirely new fraud policies and processes altogether.  EWB's Compliance Policies to Combat

8  Fraud and Money Laundering contextualize EWB's fraud and compliance objectives in digital

9  banking by also aligning them with EWB's specific business objectives and revealing EWB's plan

10  and timeline for rolling out Velo's fraud policies and processes.  Representative examples of

11  EWB's Compliance Policies to Combat Fraud and Money Laundering trade secrets are located in

12  Shanker's document production at SHANKER_0000099 and EWB's document production at

13  EWB_0001167.

14          Trade Secret 11:  Digital Banking Expense Forecasts

15          EWB's Digital Banking Expense Forecasts detail EWB's compilation and summaries of

16  third party vendors and pricing for projects and individual staffing in connection with the

17  development and build of the Velo platform.  EWB's Digital Banking Expense Forecasts contain

18  information such as how many individuals EWB hired for specific roles, which third party vendors

19  those individuals are affiliated with, each individuals' start date and end date, and each

20  individuals' salary and/or cost to EWB.  In conjunction with EWB's roadmaps, EWB's Digital

21  Banking Expense Forecasts also disclose EWB's plans for present and future development of

22  projects.  Competitors accessing these documents can take advantage of the expected internal and

23  external team size and composition required to develop similar products and feature sets, as well

24  as the compensation and pricing EWB is expending for those roles.  Representative examples of

25  EWB's Digital Banking Expense Forecasts trade secrets are located in EWB's document

26  production at EWB0000016, EWB0000017.

27          Trade Secret 12:  Target Customer Strategies

28          EWB's Target Customer Strategies illustrate EWB's internal strategies for targeting

1   customers, including but not limited to, a compilation of existing and prospective customers and

2   resultant customer segmentation.  The Target Customer Strategies further disclose EWB's analysis

3   of which product features will be most popular with which customers and therefore, where EWB

4   will allocate its resources and marketing campaign efforts to maximize efficiency while achieving

5   its customer acquisition goals.  EWB's Target Customer Strategies also disclose what future

6   products, features and processes EWB plans to implement in the next iterations of its banking

7   platform to continue attracting and engaging customers.  EWB's Target Customer Strategies also

8   disclose EWB's research on various marketing technology vendors, including their strengths and

9   weaknesses, and pricing.  Representative examples of EWB's Target Customer Strategies trade

10  secret are located in Shanker's document production at SHANKER_0002402,

11  SHANKER_0002406 and in EWB's document production at EWB0000019, EWB0001115.

12          Trade Secret 13:  Analytics Layer Strategy

13          EWB's Analytics Layer Strategy illustrates the methods and processes by which EWB

14  determines, tracks, and measures user acquisition and engagement, as well as compares such user

15  acquisition and engagement against benchmarks and use cases that EWB and its consultants

16  compiled.  EWB's Analytics Layer Strategy also provides the methods and plan to build a

17  platform through which EWB could prepare reports on such user data for internal analysis.  The

18  ability to analyze user acquisition and engagement quantitatively is crucial to iterate upon and

19  improve the performance and success of a product and its corresponding marketing activities.

20  Competitors having access to EWB's strategy to architect and develop an analytics layer for its

21  products, as well as the third party solutions selected to support the desired capabilities, is highly

22  valuable and can dramatically shortcut the time, effort, and resources typically required to design

23  and create an analytics layer from the ground up.  A representative example of EWB's Analytics

24  Layer Strategy trade secret is located in Shanker's document production at SHANKER_0005221

25  and EWB0000299.

26          Trade Secret 14:  Internal Strategies to Enhance Customer Experience

27          EWB's Internal Strategies to Enhance Customer Experience were developed by EWB to

28  provide steps EWB should take to ensure customers remain satisfied with their experience at EWB

EAST WEST BANK'S IDENTIFICATION OF TRADE SECRETS

1  while simultaneously ensuring the appropriate level of fraud protection and risk mitigation is in

2  place.  EWB's Internal Strategies to Enhance Customer Experience include the introduction of

3  Credit Card products for Velo customers, customer segmentation targeting, product differentiating

4  features, the corresponding Compliance policies and Fraud and Credit Risk Management measures

5  required to bring such products to market, as well as technology and marketing roadmap plans to

6  develop and market the new products to customers.  These highly detailed documents can be

7  leveraged by competitors of EWB to replicate credit card products for their customers and

8  potentially target the same customer groups.  A representative example of EWB's Internal

9  Strategies to Enhance Customer Experience trade secret is located in EWB's document production

10  at EWB0001137.

11     Trade Secret 15:  Internal Strategies to Align EWB Credit Card Strategies with EWB

12     Customer Profiles

13        EWB's Internal Strategies to Align EWB Credit Card Strategies with EWB Customer

14  Profiles were developed by EWB to devise methods by which EWB would identify customers that

15  are eligible for various credit card products, how EWB would rate the credit-worthiness of

16  customers, whether a customer was eligible for a secured or unsecured EWB credit card, and the

17  credit line EWB would extend to customers.  This proprietary information can be leveraged by

18  competitors to develop a similar strategy and compete for the same target customers for credit card

19  products near-term or in the future.  A representative example of EWB's Internal Strategies to

20  Align EWB Credit Card Strategies with EWB Customer Profiles is located in EWB's document

21  production at EWB0000002.

22     Trade Secret 16:  Peer Bank Competitive Landscape

23        The Peer Bank Competitive Landscape compiles, organizes, and highlights EWB's market

24  research data on EWB's competitors and the banking industry overall, enabling EWB to compare

25  the strengths and weaknesses of its position across a number of metrics, including total asset

26  growth over time, return on assets growth, return on earnings growth, and its profitability mix.

27  This compilation and the attendant formulas and codes that underpin the compilation were the

28  result of significant time, research, and investment by EWB.  A representative example of EWB's

1    Peer Bank Competitive Landscape trade secret is located in Shanker's document production at

2    SHANKER_0000034.

3

4    DATED:  May 12, 2021                Ekwan E. Rhow
                                         Grace W. Kang
5                                        Jonathan M. Jackson
                                         Aharon B. Kaslow
6                                        Bird, Marella, Boxer, Wolpert, Nessim,
                                         Drooks, Lincenberg & Rhow, P.C.
7

8

9                                        By:      /s/ Grace W. Kang

10                                                 Grace W. Kang
                                             Attorneys for Plaintiff East West Bank
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28